No. 22,148.

LOUIS PAULICH, *Appellee,* v. F. E. NIPPLE, *Appellant.*

SYLLABUS BY THE COURT.

1. PHYSICIANS—*Malpractice—Evidence—Expert and Nonexpert Witnesses.* The following rule, stated in the syllabus in *Sly v. Powell,* 87 Kan. 142, 123 Pac. 881, is applied to the facts in the present case:

   "Nonexpert witnesses can testify as to external appearances and manifest conditions observable by any one, but whether a surgical operation has been performed with a reasonable degree of skill, knowledge and care, and whether the patient was thereafter skillfully and properly treated, are questions of science to be established by the testimony of witnesses of special skill and experience, and not by testimony of those who are without special learning and skill as to such operations and practice." (syl. ¶ 1.)

2. SAME. A physician is bound to possess and exercise that degree of skill which is ordinarily possessed by physicians in practice, but where his errors are those of judgment only, if he keep within recognized and approved methods, he will not be liable for their consequences.

3. SAME. Negligence of a physician or surgeon cannot be presumed from the mere failure to obtain the best results from an operation or treatment; and in this case, there being no proof of a want of skill or care on the part of defendant, it was error to set aside a judgment in his favor and grant a new trial.

Appeal from Crawford district court; ANDREW J. CURRAN, judge. Opinion filed May 10, 1919. Reversed.

*Edwin D. McKeever,* of Topeka, and *A. H. Carl,* of Mulberry, for the appellant.

*Thomas W. Clark,* of Pittsburg, for the appellee.

The opinion of the court was delivered by

PORTER, J.: The action was to recover damages alleged to have resulted from the malpractice of a physician and surgeon. The defendant appeals from an order setting aside a judgment in his favor and granting plaintiff a new trial.

The plaintiff was nineteen years old when he was injured by the fall of a heavy mass of rock from the roof of a mine where he was digging coal. The accident resulted in the fracture of the femur of the right leg, about three inches above the knee.

The petition alleged that defendant was employed to treat the injury and reduce the fracture, and that he negligently permitted the broken ends of the bone to overlap and to remain in that condition; that by means of splints and bandages he improperly and negligently bound up the bones and muscles of plaintiff's leg; that plaintiff, relying on his wrongful assurances that the fracture had been properly reduced, permitted him to continue to treat the injury; and that by reason of the negligent manner in which defendant treated the injury, plaintiff had suffered great pain, and would be obliged to undergo a dangerous and painful operation, necessitating the rebreaking and resetting of the bone by a competent surgeon. The answer was a general denial.

Plaintiff testified that after the injury he was carried home on a door by his fellow employees, and that when the doctor arrived he took a pair of scissors, ripped the trousers, took off the shoe, and bathed the plaintiff, and with the assistance of others reduced the fracture; that after the doctor had finished the manipulation a bed slat was taken and a bed sheet was torn up in strips and rolled up, the bed slat wrapped with cotton and with the bed sheeting, and then bound to the leg with sheeting and adhesive plaster over the strips; and that he was then placed in bed, and a weight consisting of a flatiron fastened to the leg by cords and adhesive plaster, and the weight hung over the end of the bed. The flatiron was offered in evidence. The doctor remained there for about an hour and a half. The plaintiff did not know whether the doctor measured the leg or not at that time. He was asked whether the doctor made an examination of the leg when he returned the next day and on several days following, and answered, "No"; but testified that the doctor raised up the bedclothes and looked at his leg, and told him that he was getting along all right. A week after the accident the doctor was called for the reason that the bandages had become loose on the splint; and, the swelling having gone down, there was play between the leg and the bed slat. Asked what the doctor did, he answered: "He came and took them bandages up and kind-a doubled them down this way and just wrapped some more of that adhesive plaster on top of that. Before that he examined my leg and discovered a knot there, and he said, 'Louis, there is a nice little knot there and your leg is doing fine.'" He testified that the doctor did not call

Paulich v. Nipple.

every day, but often stopped when passing; that about seven weeks after the injury the doctor removed the bed slat and bandages, got hold of the foot and raised up the leg, and that the leg bent right at the fracture, bent upward; that the doctor then called for some pasteboard, soaked it in water and bandaged it on, and made plaintiff get up out of bed and stand up, and then he examined the leg. Witness described how the pasteboard was fastened around the leg with gauze bandages and adhesive plaster, but said that he was unable to stand without his crutches; that the doctor measured the leg and remarked, "It is a little short, just about a quarter of an inch short; but that can't be helped; in all these cases there is some shortage"; that about one week later the doctor called and removed the pasteboard splint, and said, after examining the leg, "Louis, you got a good leg on you"; about as good as he expected it to turn out. Plaintiff received his injury on the 17th day of June, 1915, and his testimony is that he did not know the condition of his leg until he had an X-ray picture taken in March, 1916. The picture was introduced in evidence.

The only expert testimony offered by the plaintiff was that of a physician who had lived in that community for fifty years, and who qualified as a skilled physician and surgeon. He testified to the method he employed in reducing a fracture, that various kinds of splints were used; wooden splints that can be molded to the part, various kinds of fiber splints, pasteboard and plaster of Paris, and other forms; and that these have to be changed repeatedly, depending upon indications. His direct examination showed nothing from which a jury would be justified in finding that the method adopted by the defendant was not proper.

On cross-examination he testified that a fracture of a bone near to a joint is serious and difficult to reduce, and described the various methods used to accomplish coaptation, and approved either or any of the various ways that would appeal to the judgment of the surgeon; that with a transfracture there is more or less breaking of the edges of the bone where the injury is caused by direct violence, and that it is very difficult to get the ends to fit in exactly with a smooth result; that sometimes there is an enlargement and most always some deformity follows the union; and that when ossification begins it enlarges around the line where the cement furnished by nature is se-

creted. His testimony is that very frequently there is a little overlapping and that it is very difficult to prevent, necessitating frequent changes of the splints in order to keep these things from occurring. We quote further from his testimony:

"Q. After all, Doctor, the treatment of a fracture and complications arising afterwards is a matter for the individual judgment of the surgeon treating the case? A. Yes, sir, largely.

"Q. And you wouldn't say a surgeon who used a different method than you in reducing a fracture was wrong or guilty of a lack of care and skill? A. No, sir.

"Q. And one surgeon, with the best of care and skill and learning, might adopt one method and another another? A. Certainly.

"Q. And when complications arise one surgeon might follow and adopt one method and another another? A. Yes, sir, and all get good results.

"Q. And none of them get good results? That might occur? A. Yes, sir.

"Q. And as to the necessity of a second operation, that might be a matter of judgment? A. Certainly.

"Q. Whether or not he would undertake a serious rebreaking, a readjustment, would be a matter of judgment? A. Necessarily.

"Q. And he might be justified in not doing it under the peculiar circumstances of his patient? A. Certainly.

. . . . . . . . . . . . .

"Q. Wherever you get the fractured ends of the bones to touch, you are getting a good union? A. You are going to get a good union if you can positively establish immobilization.

"Q. Assuming you have immobilization, then you must depend upon the patient? A. To an extent.

"Q. And to a large extent? A. To a large extent; yes, sir.

"Q. And even a small amount of moving back and forth, or agitation of that limb, is liable to produce a bad effect? A. Yes, sir."

His testimony is that the surgeon uses his own judgment as to the kind of a splint, and depends sometimes on what he has on hand; that where a physician goes some distance and finds a fractured bone, he may use a shingle, or a cane, or umbrella, or anything for a temporary splint, and that a board or flat surface is better; that if the board once employed is doing the work, it is not disturbed; that the use of a weight to hold the bones in position and to control the muscles is a matter of opinion of the physician; that the weight produces pain and distress and annoys the patient, and tempts him to remove it and adjust it to suit himself; and that it would be a matter of judgment with the surgeon what to do where the

Paulich v. Nipple.

question arose with reference to a rebreaking and readjust-
ment of the fracture. He himself would advise consultation
and hospital attention, but testified that the decision whether
to leave the condition as it was or attempt to get better re-
sults by rebreaking depended upon the judgment of the phy-
sician and the conditions.

In a city with many able and skillful physicians and sur-
geons, the only expert called to testify on behalf of plaintiff
was the one physician, who neither criticised nor condemned
the methods employed by the defendant in the treatment of
plaintiff's injury. The burden rested on plaintiff to show
affirmatively that the conditions he complains of were caused
by the failure of the defendant to exercise ordinary skill and
care in performing the operation of reducing the fracture, or
in the subsequent course of treatment for the injury. (*Petti-
grew v. Lewis,* 46 Kan. 78, 26 Pac. 458.) In a very early case,
this court recognized the doctrine that a physician or surgeon
is not held to the exercise of the highest degree of skill, nor
as warranting a cure or the success of an operation. (*Erastus
Tefft v. Hardin H. Wilcox,* 6 Kan. 46, followed in *Branner
v. Stormont,* 9 Kan. 51.) In *Pettigrew v. Lewis,* supra, the
following excerpt from the opinion in the Tefft case was quoted
with approval:

"'His contract, as implied in law, is that he possesses that reasonable
degree of learning, skill and experience which is ordinarily possessed
by others of his profession; that he will use reasonable and ordinary care
and diligence in the treatment of the case which he undertakes; and
that he will use his best judgment in all cases of doubt as to the proper
course of treatment. He is not responsible in damages for want of suc-
cess, unless it is shown to result from a want of ordinary skill and learn-
ing, and such as is ordinarily possessed by others of his profession, or
from want of ordinary care and attention. He is not presumed to en-
gage for extraordinary skill, or for extraordinary diligence and care,
nor can he be made responsible in damages for errors in judgment, or
mere mistakes in matters of reasonable doubt or uncertainty.'" (p. 80.)

A physician or surgeon cannot be held liable for the results
of an honest error in judgment, if it is shown that he possesses
a reasonable degree of skill and learning in medicine and
surgery, and that he used ordinary skill and care in the diag-
nosis, operation, and treatment of the plaintiff. (*Stout
v. Bowers,* 97 Kan. 33, 36, 154 Pac. 259.)

In the case of *Sly v. Powell,* 87 Kan. 142, 123 Pac. 881, which was an action to recover damages for malpractice for failing to properly reduce a dislocated hand, the same rule was applied, and an instruction to the effect that—

"Nonexpert witnesses can testify as to external appearances and manifest conditions observable by any one, but whether a surgical operation has been performed with a reasonable degree of skill, knowledge and care, and whether the patient was thereafter skillfully and properly treated, are questions of science to be established by the testimony of witnesses of special skill and experience, and not by testimony of those who are without special learning and skill as to such operations and practice." (syl. ¶ 1.)

The case at bar is similar to the case of *Pettigrew v. Lewis,* supra, where it was said in the opinion:

"There was no proof, however, of a want of skill or care on the part of the defendants; and negligence cannot be presumed." (p. 81.)

It is true that the physician is bound to possess and exercise that degree of skill which is ordinarily possessed by physicians in practice (*Barnes v. Means,* 82 Ill. 379), but where his errors are those of judgment only, if he keep within recognized and approved methods, he will not be liable for their consequences. (See cases cited in Note, 37 L. R. A. 830.)

It has never been the rule that a lawyer who is not shown to be unskilled in his profession is liable because a client sustains damages by following his advice, honestly given, but which is subsequently determined by a final decision of a court to be erroneous. A physician stands in the same attitude as to liability for his mistakes as does a lawyer. No reason can be assigned for making a distinction between them, or for holding a physician or surgeon liable in damages for an honest error in judgment. A moment's reflection upon the circumstances and emergencies under which physicians are frequently called upon to act will demonstrate some of the disastrous results that would follow if the law permitted them to be mulcted in damages upon testimony as to the character of their professional services given by nonexpert witnesses. If such were the law, physicians and surgeons might as well be held to guarantee a successful cure or a successful operation in each instance. The reason for the rule is so well stated by the supreme court of Minnesota that we quote at some length from the opinion in *Staloch v. Holm,* 100 Minn. 276:

Paulich v. Nipple.

"Physicians, in the nature of things, are sought for and must act in emergencies, and if a surgeon waits too long before undertaking a necessary amputation, he must be held to have known the probable consequences of such delay, and may be held liable for the resulting damage. . . . Most professional men are retained or employed in order that they may give the benefit of their peculiar and individual judgment and skill. A lawyer, for example, does not contract to win a lawsuit, but to give his best opinion and ability. He has never been held to liability in damages for a failure to determine disputed questions of law in accordance with their final decision by courts of appeal. It would be just as unreasonable to hold a physician responsible for an honest error of judgment on so uncertain problems as are presented in surgery and medicine. . . . On two historic occasions the greatest surgeons in our country met in conference to decide whether or not they should operate upon the person of a president of the United States. Their conclusion was the final human judgment. They were not responsible in law, either human or divine, for the ultimate decree of nature. The same tragedy is enacted in a less conspicuous way every day in every part of the country. The same principles of justice apply. Shall it be held that in such cases, where there is a fundamental difference among physicians as to what conclusion their science applied to knowable facts would lead to, then what they, with their knowledge, training and experience are unable to decide, and what, in the nature of human limitations, is not susceptible of certain determination, shall be autocratically adjudged by twelve men in a box, or by one man on the bench, or by a larger number in an appellate court, none of whom are likely to have the fitness or capacity to deal with more than the elements of the controversy? All the court can properly do if an action for negligence should be brought in such a case would be to direct a verdict for the physician." (pp. 282, 283.)

It follows that, there being no evidence to justify a judgment against the defendant, it was error to grant a new trial. The order is reversed, and the cause is remanded with directions to render judgment for the defendant.