(45 P.3d 1)
No. 84,886

BRENDA and TONY GEORGE, *Appellants*, v. TIMOTHY RAE PAULY, M.D., *Appellee*.

Opinion filed April 13, 2001.

*Gerard C. Scott*, of Prochaska & Scott, of Wichita, for appellants.

*Michael R. O'Neal*, of Gilliland & Hayes, P.A., of Hutchinson, for appellee.

Before GREEN, P.J., BEIER, J., and DAVID PRAGER, Chief Justice Retired, assigned.

BEIER, J.: Appellants Brenda and Tony George appeal the summary judgment granted to defendant Dr. Timothy Pauly in this medical malpractice action. The Georges' infant son, Zachary, died from complications arising out of a bowel disorder the Georges allege Pauly should have recognized and treated earlier. The district court granted judgment to Pauly because of a perceived lack of admissible evidence supporting causation. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

We address three issues: (1) whether the district court erred by granting defendant's motion in limine prohibiting a designated expert who gave no opinions regarding causation during his discovery deposition from testifying at trial on causation; (2) whether the district court erred by granting defendant's motion in limine prohibiting causation testimony from a treating physician who was not finally designated as an expert; and (3) whether, in the absence of the designated expert's causation testimony, the plaintiffs lacked causation testimony sufficient to survive a summary judgment motion.

Zachary was born on April 28, 1994, and died on June 22, 1994, following his diagnosis and surgery for Hirschsprung's disease. Hirschsprung's disease is a congenital dilation and hypertrophy of the colon due to the absence or reduction of ganglion cells.

Zachary had been dismissed from the hospital as a newborn on April 30, but he had not had an initial bowel movement. His parents were told to call Pauly if Zachary continued without a bowel movement, which they did. Pauly, a family practitioner, saw Zachary in his office on May 2, 1994, and ordered a barium enema on the same day. The radiology report stated: "The colon and rectum contain a moderately large amount of fecal material. The colon and rectum are normal in caliber. No mechanical obstructions are seen."

Based on this report, Pauly noted that he must consider other possibilities "after ruling out Hirschsprung's." He recommended waiting another 24 hours to see if Zachary had a bowel movement; if not, he recommended that Zachary see a pediatrician.

Pauly saw Zachary again on May 6 and May 9. Although Zachary had lost more than 18 ounces of his birth weight of 8 pounds, ½ ounce by the May 6 visit, he was not vomiting and was having daily bowel movements. At the second visit, Zachary was likewise reported to have stopped vomiting. By May 16 when Zachary saw Pauly again, he had gained some weight and possibly had a cold. By June 2, when Pauly saw Zachary, he was concerned that the baby's weight had leveled off, and he recommended the baby start on formula as well as nursing. By June 6, the baby had gained 10 ounces but remained below birth weight. Defendant directed the Georges to come in for a return visit in 1 week.

Instead, the Georges brought Zachary to the emergency room in Ellsworth on June 10. They said he had vomited four times the day before, was grunting on and off, and appeared to be gray and dusky in color. Observing the symptoms of sepsis, a physician's assistant called defendant, who called a pediatrician, and they recommended that the baby start on antibiotics.

The baby was taken by ambulance to Wesley Medical Center in Wichita, where he was cared for by Dr. Curtis Pickert, a pediatric critical care specialist. Pickert's report indicates Zachary was in overwhelming shock, secondary to sepsis or toxicity related to a bowel obstruction. Although the Wesley personnel were able to stabilize him, his condition continued to deteriorate through June 12, when he was taken to surgery.

The surgical procedure led to a diagnosis of Hirschsprung's disease, and Zachary underwent a colostomy and placement of a peritoneal dialysis catheter to treat renal failure on June 12, 1994. Over the next week, Zachary continued to go downhill, and he was taken off of mechanical life support just before his death on June 22.

Pickert said Zachary died of multi-organ system failure secondary to bacterial sepsis, which was secondary to all of the intervention and the toxicity of the disease process. Zachary had developed toxic enterocolitis secondary to the Hirschsprung's disease, and his renal failure subsequent to that had led to the necessity of major instrumentation to keep him alive.

The Georges alleged in this action that Pauly negligently diagnosed and treated their son, resulting in his wrongful death.

Dr. Phillip Cherven, a pediatrician retained by the defense, explained at his deposition that the initial symptoms of Hirschsprung's are irregular or absent bowel movements, vomiting, or abdominal bloating. A barium enema is appropriate as the first diagnostic test when Hirschsprung's is suspected. It is used to identify the area of the patient's colon that is constricted or pinched, with a dilated portion above. If the patient has the disease, the constricted portion of the bowel lacks ganglion cells and does not allow fecal contents to enter from the normal colon above the constricted area. When a barium enema does not reveal a constriction of the bowel, it points against Hirschsprung's but does not rule out the diagnosis completely.

The next diagnostic step is a biopsy. Dr. Keith Ashcraft, the surgeon-in-chief at Children's Mercy Hospital and another defense expert, testified at his deposition that two types of biopsies can be done. In a suction biopsy, a small metal capsule is placed inside the rectum to suck and cut mucosa off of the wall of the bowel, and the mucosa is checked for ganglion cells. An open biopsy requires anesthesia and dilation of the rectum. It involves cutting out a block of tissue from the wall of the colon, which is called a "full thickness biopsy." This biopsy is more accurate because there are two layers of tissue that can be checked for ganglion cells.

Once the disease is diagnosed, Ashcraft explained, the treatment is surgery to bypass the abnormal part of the colon. Mortality from

the surgery depends on where the surgery is performed and the condition of the baby. Mortality from the disease is associated with the development of enterocolitis, which is an erosion of the lining of the colon that allows bacteria normally residing in the stool to reach the bloodstream. According to Ashcraft, Hirschsprung's is usually diagnosed before the patient develops this very serious condition.

The plaintiffs designated Dr. Robert Pantell, a pediatrician, as their expert. Pantell gave his discovery deposition in 1996 and a trial deposition in 1999.

At his discovery deposition, Pantell testified Pauly deviated from the standard of care in two ways: (1) He failed to communicate adequate details of Zachary's symptoms to the radiologist when he ordered the initial barium enema; and (2) he failed to take appropriate steps in response to Zachary's low weight, including hospitalization and a referral to a pediatric gastroenterologist or surgeon.

Relating to causation, Pantell testified that he could not tell if the radiologist would have done anything differently if he had been given the additional information he suggested or its effect on direct causality. Likewise, Pantell testified that he would defer to a gastroenterologist or surgeon for success rates for the surgery to treat the disease. He was also critical of the fact that the baby did not receive intravenous fluids while being transferred from Ellsworth to Wichita; however, he could not say whether such fluids would have made any difference.

Defense experts also testified during their discovery depositions on causation: Cherven said Zachary "probably" would have survived if he had been diagnosed before June 10. Dr. Larry Anderson, a family practice physician, testified that the baby would probably be alive today if everything had gone well with the diagnosis and surgery.

The day before Pantell was set to give his trial deposition, Pauly filed a motion in limine to prohibit Pantell from offering opinions different from those expressed at the earlier discovery deposition. Defendant sought to preclude Pantell from using medical literature to supplement his opinions, arguing that K.S.A. 2000 Supp.

60-226(e) required supplementation of expert opinions and interrogatory responses at least 30 days before trial.

In the trial deposition, Pantell opined that Zachary's disease was treatable and that there was tremendous success in treatment if the disease was detected early. In addition, he read from a medical textbook: "Results of treatment of Hirschsprung disease are generally satisfactory with a great majority of patients achieving fecal continence."

The district court granted Pauly's motion to exclude Pantell's causation testimony after the trial deposition had been taken.

Pickert, the treating pediatric critical care physician at Wesley, also gave deposition testimony on causation. He stated in his deposition that it was obvious a diagnosis prior to Zachary's development of toxicity would have made a difference in the ultimate outcome. Pickert had been designated by the plaintiffs in an interrogatory response as a possible witness on causation, and he was listed as a witness in the pretrial order. However, Pauly successfully moved to exclude Pickert's causation testimony at trial, because he had not been designated in the pretrial order as an expert.

After the defense motions in limine were successful, the district court granted Pauly's motion for summary judgment, ruling that the Georges lacked evidence of causation and thus could not prevail as a matter of law.

### Pantell's Testimony

Plaintiffs contend the district court erred in granting defendant's motion in limine prohibiting Pantell from giving causation testimony. Defendant's motion stated that Pantell was not qualified to give causation testimony because it was beyond his expertise. Plaintiffs argue that a physician who is not a surgeon may be competent to testify as to causation resulting from a delayed diagnosis of a condition requiring surgery.

"The qualification of an expert witness as well as the admissibility of expert testimony are matters within the broad discretion of the trial court. . . . Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of say-

ing that discretion is abused only where no reasonable person would take the view adopted by the trial court." *City of Wichita, Kansas v. Eisenring*, 269 Kan. 767, 776, 7 P.3d 1248 (2000). However, if a district court's decision to admit expert testimony is based upon an interpretation of K.S.A. 60-3412, we have de novo review. *Endorf v. Bohlender*, 26 Kan. App. 2d 855, 860, 995 P.2d 896, *rev. denied* 269 Kan. 932 (2000).

Plaintiffs cite *Glassman v. Costello*, 267 Kan. 509, 986 P.2d 1050 (1999), and *Tompkins v. Bise*, 259 Kan. 39, 910 P.2d 185 (1996), in support of their argument that Pantell did not need to be a surgeon to be competent to testify as to causation. Plaintiffs are correct that these cases support the argument that a physician need not always practice the same medical specialty as a defendant in a medical malpractice action to give expert opinions on standard of care. However, we believe the parties' focus on Pantell's expertise or lack thereof—to give standard of care opinions or causation opinions—fails to identify the controlling infirmity in Pantell's discovery deposition testimony.

Simply stated, the problem with Pantell's causation testimony was not his competence to give it but its complete absence. We have carefully reviewed the transcript of the discovery deposition. That record demonstrates that, for whatever reason, Pantell was unwilling or unprepared to express a causation opinion to a reasonable degree of medical certainty, as required by *Nunez v. Wilson*, 211 Kan. 443, Syl. ¶ 1, 507 P.2d 329 (1973) ("Expert witnesses should confine their opinions to relevant matters which are certain or probable, not those which are merely possible.").

In *Sharples v. Roberts*, 249 Kan. 286, 816 P.2d 390 (1991), plaintiff brought a suit against a defendant doctor claiming a failure to perform necessary tests and make a urology referral prevented earlier discovery of a kidney stone that led to loss of plaintiff's kidney. The district court granted the defendant doctor's summary judgment motion based upon its finding of a lack of expert medical testimony to support causation. The plaintiff's expert was unable to come to a firm conclusion as to whether earlier diagnosis would have made a difference, and he was only able to say that it was possible that defendant's failure to perform the tests could have

contributed to the ultimate loss of the kidney. The Kansas Supreme Court affirmed this judgment, finding the expert's opinion insufficient to establish that the delay in testing caused or contributed to the plaintiff's deterioration, and stated that this type of testimony "falls far short of the degree of medical probability or certainty required to support the necessary element of causation." 249 Kan. at 297.

Pantell's testimony in his discovery deposition is qualitatively comparable to that of the physician expert in *Sharples*. He gave clear and committed opinions on deviations from the standard of care, but, when it came time to opine on causation, he balked. He was unable to testify as to what the radiologist would have done with the additional information Pauly should have communicated; he declined to discuss the success rates of the necessary surgery; he backed away from stating that IV fluids during transfer would have made a difference in Zachary's chances.

Although the district court erroneously granted the motion in limine prohibiting Pantell from testifying as to causation based on his qualifications, the district court was correct in prohibiting the testimony. Pantell's causation testimony fell far short of the degree of medical probability or certainty required to support causation. If a trial court reaches the right result, its decision will be upheld even though the trial court relied upon the wrong ground or assigned erroneous reasons for its decision. *Bergstrom v. Noah*, 266 Kan. 847, 875-76, 974 P.2d 531 (1999). Pantell's causation testimony was properly excluded.

### Pickert's Testimony

The Georges next argue the district court erred in granting defendant's motion in limine prohibiting Pickert, a treating physician, from testifying about causation because he was not designated as an expert witness. In fact, the motion in limine had suggested two other reasons for prohibiting this testimony: Pickert's deposition statement that he was not providing causation testimony and the argument that his causation opinions were not supported by a reasonable degree of medical certainty. We hold that none of these

arguments supports the district court's decision to exclude Pickert's causation testimony.

First, we believe the issue surrounding the manner of Pickert's designation is controlled by this court's previous decision in *West v. Martin*, 11 Kan. App. 2d 55, 713 P.2d 957, *rev. denied* 239 Kan. 695 (1986). In *West*, plaintiff responded to an interrogatory by stating that she expected to call all treating physicians, and she attached a witness list that listed the treating physician in question. The district court later refused to allow the treating physician to testify as an expert witness because he was not identified on the plaintiff's witness list as an expert. On appeal, we found the district court abused its discretion in limiting the treating physician's testimony because defendant knew that plaintiff intended to call the witness and was obviously not deceived. 11 Kan. App. 2d at 58; see also *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1027-28, 850 P.2d 773 (1993) (relying upon *West* in upholding the district court's admission of the testimony of treating physicians who had been deposed where defendant was not misled or surprised).

In this case, the Georges stated that Pickert would give causation testimony in their answer to one of Pauly's interrogatories. Pickert drafted a written report, which was provided to defendant. Pauly and his counsel were thus fully aware during discovery of plaintiffs' plans to use Pickert. A reference to the designation of Pickert as an expert was made at his deposition, and his opinions were fully explored. There was no surprise that would justify excluding any causation testimony he had already given at deposition.

Pauly's second argument that Pickert himself admitted he was not planning on giving causation testimony is based on the following passage from Pickert's deposition:

"Q. I want you to assume with me for purposes of this question that in a medical malpractice action in the state of Kansas, the burden is on the plaintiff to establish that the defendant doctor owed a duty of care to a particular patient, that that duty was breached, in other words, there was a deviation from the applicable standard of medical care, and in addition to that, as a result of that deviation, damages were caused or there was a causative connection between the breach or the deviation from the applicable standard of care and the result and that's what we talk about in the way of causation. Do you understand that, Doctor?

"A.   Yes.

"Q. Do you understand that's what you were asked to determine, whether or not there was any causation in this case?

"A. No.

"Q. That's not what I understood you to say earlier and so I think we're tracking correctly.

"What I'm understanding you to be saying is that you understood that you were being asked to indicate whether or not a different—retrospectively, whether a different course of action could have changed the outcome in this case.

"A. That's correct."

The problem with this argument is that it bestows on Pickert the power to make a call he is not qualified by training and experience to make. He is a doctor, not a lawyer or a judge, and it is not for him to characterize the nature or proper use of his medical opinions in a court of law. Regardless of defense counsel's success in leading him to make such a characterization, the remainder of Pickert's deposition makes clear that he in fact held opinions on causation. He stated unequivocally that a diagnosis of Hirschsprung's before the onset of toxicity would have made a difference for Zachary.

Finally, we are also satisfied that Pickert should not be prohibited from testifying because his causation opinions lacked a reasonable degree of medical certainty. "The expressions 'probably,' 'more likely than not,' and others of similar import are proper qualifications for a medical expert's opinion testimony if, taken as a whole, the testimony reflects an honest expression of professional opinion as to reasonable medical probabilities." *Pope v. Ransdell*, 251 Kan. 112, Syl. ¶ 4, 833 P.2d 965 (1992). In his deposition, Pickert described the causal relationship between the timing of the diagnosis and the outcome as *obvious*. This is hardly namby-pamby.

Moreover, Pickert backed up his causation opinions with a detailed description of Zachary's condition when he arrived at Wesley and the ensuing heroic efforts to save him. He contrasted this course with the ordinary progression of events when a diagnosis has been made at an earlier stage of the disease:

"The typical course of Hirschsprung's Disease is that of initial suspicion of the diagnosis which is then confirmed by x-ray and biopsy of the colon to demonstrate absence of ganglion cells. When the diagnosis is made, colostomy or ileostomy can be performed and diversion of fecal material accomplished, preventing the

obstruction of the bowel which may otherwise ensue. In this case, the physician had appropriately considered this diagnosis and performed a barium enema which is a standard diagnostic tool in this situation. Unfortunately, the transition zone may not be evident in the first six weeks of life. [Citation omitted.] This may unfortunately lead the practitioner to believe that the diagnosis has been ruled out, when in fact the disease may still be present."

When Pickert's testimony is viewed as a whole, it "reflects an honest expression of professional opinion as to reasonable medical probabilities." 251 Kan. 112, Syl. ¶ 4. Reduced to its essence, he says that a timely diagnosis and surgery were necessary to prevent Zachary's bowel obstruction and resulting toxicity. The toxicity led to multiple organ system failure and death.

For all of the foregoing reasons, the district court should have permitted Pickert to testify as to causation.

## Other Evidence of Causation

The Georges also argue that they had marshaled causation testimony in three other forms.

The first, they say, came in the person of another of their designated experts, Dr. Ted Ganiats, who stated in his written opinion that earlier diagnosis would have made Zachary's death unlikely. We affirm the district court's refusal to consider this evidence, because plaintiffs had already said that they did not plan to call Ganiats, whose qualifications to testify had been called into question under the 50 percent rule of K.S.A. 60-3412.

Second, plaintiffs argue the district court should have considered medical treatises that supported causation. We disagree. Under the circumstances of this case and its procedural posture, the district court's refusal to do so did not constitute an abuse of discretion. See *State v. Lumley*, 266 Kan. 939, 950, 976 P.2d 486 (1999).

The Georges were provided with multiple opportunities during discovery to apprise Pauly and counsel of their intention to rely on such evidence, either because experts would do so or because they planned to submit such materials for the jury's consideration as substantive evidence under the Kansas hearsay exception for learned treatises. See *Wilson v. Knight*, 26 Kan. App. 2d 226, 229, 982 P.2d 400, *rev. denied* 268 Kan. 856 (1999). They never did so.

The district court therefore did not abuse its discretion by refusing to consider previously unidentified articles when it weighed the legal sufficiency of the evidence that would be presented in plaintiffs' case in chief. The plaintiffs may have left themselves wiggle room to introduce such evidence in rebuttal, but that was not the issue before the district court at the time. We leave its resolution for the appropriate moment on remand.

Finally, the Georges argue that the testimony of experts retained by the defendant supported causation. This argument has merit.

In the pretrial conference order, plaintiffs listed all defense experts on their witness list. Defendant does not argue that plaintiffs cannot use his expert witnesses in their case in chief; rather, he argues his witnesses answered questions only in a general manner that is insufficient to support causation.

In *Wilson*, plaintiff brought three claims against defendant, including his failure to diagnose and treat a postoperative infection. The defendant's motion for a directed verdict on this claim for lack of causation evidence was denied. On appeal, this court found the following evidence was sufficient to submit the causation question to the jury: "Dr. Bronsther's testimony that antibiotics help cure infection and would have helped in this case tends to prove Dr. Knight's failure to treat Wilson with antibiotics after the surgery led to his infection." 26 Kan. App. 2d at 232.

We believe the remarks of both Cherven and Anderson were sufficient under the standard for specificity set by *Wilson*.

The deposition of pediatrician Cherven contains the following passage:

"Q.   If Dr. Pauly had been able to arrive at the sufficiently high clinical suspicion which would result in him transferring the patient to Wichita or some other facility back on May 2nd or any time during the month of May, we can say that the baby probably would have lived, then; would that be fair to say?

"A.   I think there would have been—of course, there would have been a greater chance. Even if the diagnosis was made before the baby developed enterocolitis, and there's always some risk to doing the surgery, there's always some risk even then of developing enterocolitis and having not survived it, so yes, I think it would be a fair statement to say the baby probably would have done better, but that is by no means a certainty.

"Q. We can look at the different steps along the way in terms of attempting diagnosis and we can't be sure that—whether or not doing any of those would have resulted in more timely diagnosis, but if, in fact, we are to assume that the baby gets a referral to a pediatric surgeon for a biopsy which is done sometime in the month of May and the diagnosis of Hirschprung's is made in the month of May and the surgery is undertaken and completed in the month of May, then other than the risk factors associated with surgery, the baby would probably live; correct?

. . . .

"A. Yeah, probably would have survived if the diagnosis could have been made prior to June the 10th."

Likewise, the deposition testimony of Anderson, a family practice physician, included the following:

"Q. But certainly as it relates to this case, if there had been some reason to have done further studies and the diagnosis could have been made before the onset of the enterocolitis, then we would have saved this child's life; is that correct?
"A. That would be the hope, that's right.
"Q. Well, not only the hope, but probably the expectation, correct?
"A. As you start to do studies and, you know, Dr. Pauly had a list of studies that he would have done if the barium enema, the gastrograph and enema had not been, quote, normal, and if the baby had not grown then well, then Dr. Pauly would have arranged for other studies. Every time you do a study, there's a risk of injury. There's a risk of the study coming back and giving you bad information.
"And what you're saying is right that if we had had the diagnosis and the surgery had been done and the baby had survived surgery, which doesn't always happen, then that baby could live to be 80 years old and have a good full life. But it takes everything working well at each of those steps, and I think those of us in this area are aware of the difficulty.
"The biopsy to diagnose Hirschsprung's disease is a difficult biopsy to do and interpret, and so you would hate to do the biopsy, get incorrect information and then operate on a baby that didn't need to have an operation. And that has happened on occasion. So yes, if everything had gone well, then this baby could be alive today.
"Q. Probably would be alive today?
"A. I would say even probably, I would agree with that."

Grudging admissions are still admissions, and the evidence given with obvious reluctance by these two defense experts, in addition to the Pickert testimony discussed above, meant plaintiffs should have survived Pauly's motion. They came forward with adequate admissible causation evidence, and the district court erred in refusing to consider it.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.