(197 P.3d 885)
No. 98,496

JEFFREY LASHURE, *Appellant/Cross-appellee*, v. DR. MARC FELTS
and DR. TITUS DARABANT, *Appellees/Cross-appellants*.

Opinion filed December 19, 2008.

*Jerry R. Palmer* and *Meaghan M. Dalton,* of Palmer, Leatherman & While, L.L.P., of Topeka, for appellant/cross-appellee.

*James D. Oliver, Thomas L. Theis,* and *Marta Fisher Linenberger,* of Foulston Siefkin LLP, of Topeka, for appellees/cross-appellants.

Before GREENE, P.J., HILL, J., and BRAZIL, S.J.

HILL, J.: Jeffrey LaShure sued two emergency room doctors, Marc Felts, M.D., and Titus Darabant, M.D., for incorrectly diagnosing his condition as gout, a purine metabolism disorder. LaShure discovered later that he suffered from osteomyelitis, a bacterial bone infection. This appeal centers on a claim of jury

instruction error. The trial court gave several instructions from Pattern Instructions for Kansas (PIK) that were not objectionable. But this appeal arises from the trial court reading a paraphrased jury instruction pulled from an old Kansas Supreme Court opinion. The instruction, drafted in negative terms, tried to tell the jury what the law was not. It injected new ideas into the case that served only to confuse and mislead the jury. Jury instructions must clearly express the law to the jury, not obscure it. Because we cannot hold this error as harmless, we must reverse and remand the case for a new trial.

Also, the two doctors cross-appeal, claiming LaShure's expert witness failed to prove that their negligence caused his damages. An appellate court will not reweigh the evidence, evaluate credibility, or decide factual disputes. When we view the record in the light most favorable to the appellant, as the law requires, we hold that LaShure's witness' testimony is sufficient to show causation. Therefore, we deny the cross-appeal.

*LaShure vainly seeks help for his hurting foot.*

Jeffrey LaShure is diabetic with a history of gout. After completing his shift at a Manhattan convenience store, on June 5, 2003, LaShure went to the emergency room at Geary Community Hospital complaining of foot pain. Dr. Marc Felts examined LaShure. Based on the examination and LaShure's medical history, Dr. Felts diagnosed and treated LaShure for gout. He prescribed medicine for pain and medicine for gout and told LaShure to elevate his foot and consult with a podiatrist if his condition worsened.

Three days later, LaShure returned to the emergency room because his foot pain had increased. This time, Dr. Titus Darabant examined LaShure. After examining LaShure and reviewing his medical records from the prior visit, Dr. Darabant continued the treatment for gout. He thought the gout medicine had not yet been effective because of LaShure's continuous standing at work since his prior emergency room visit. Dr. Darabant prescribed the next stage of gout treatment and told LaShure to follow up with his primary care physician within 24-48 hours whether his condition improved or not.

Following up, LaShure called his primary care physician on June 9, 2003. His doctor gave LaShure a prescription but did not see him. Because LaShure's condition did not improve, he had an x-ray on June 12. The doctors read it as normal. LaShure's primary care physician saw him on June 16 and told LaShure they could treat his foot with oral antibiotics or admit him to the hospital. LaShure chose to go to the hospital and received antibiotics intravenously. The next day, LaShure had a magnetic resonance imaging test that revealed osteomyelitis, a bacterial bone infection in his foot. Based on this diagnosis, LaShure had surgery to remove infection from his foot and implant a catheter for the continued intravenous administration of antibiotics. He stayed in the hospital for about a week.

*We list some details about LaShure's lawsuit and trial.*

On July 9, 2004, LaShure filed a medical malpractice action against Dr. Felts and Dr. Darabant in Geary County District Court. At trial, he asserted both doctors had departed from the applicable standard of care in three ways. First, they failed to include in the differential diagnosis an infected foot in a diabetic patient. Second, they failed to treat LaShure's condition with oral antibiotics. Third, they made a presumptive diagnosis of gout. LaShure alleged that because of these departures, his "fractured and infected foot went undiagnosed until June 17, 2003." This resulted "in more pain, suffering, disability and accompanying mental anguish, medical bills and lost time from employment."

At trial, LaShure testified on his own behalf and presented the testimony of Dr. Felts; Dr. Darabant; Dr. Richard Lochamy, LaShure's primary care physician; and Dr. Joseph Donnelly, LaShure's expert witness. The defendants presented the testimony of LaShure and four expert witnesses.

The jury returned a no-fault verdict after asking the court to clarify the first paragraph of Instruction No. 15. After the court refused to clarify the instruction, the jury responded with its verdict.

*The law about review of jury instructions is clear and well settled.*

An appellate court reviews all the instructions, and isolated errors found in them do not call for reversal:

"The trial court is required to properly instruct the jury on a party's theory of the case. Errors regarding jury instructions will not demand reversal unless they result in prejudice to the appealing party. Instructions in any particular action are to be considered together and read as a whole, and where they fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. If the instructions are substantially correct and *the jury could not reasonably have been misled by them,* the instructions will be approved on appeal. [Citation omitted.]" (Emphasis added.) *Pullen v. West,* 278 Kan. 183, 203, 92 P.3d 584 (2004).

Our Supreme Court has, for some time, recommended that our trial courts use PIK instructions because the committee developed the instructions to bring accuracy, clarity, and uniformity to jury instructions. Judges should only make modifications or additions if the particular facts of a case require it. See *State v. Hebert,* 277 Kan. 61, 87, 82 P.3d 470 (2004).

*We repeat here all the professional liability instructions given at the trial.*

The following are all the court's instructions that dealt with the law of medical negligence. All but No. 15 are from pattern instructions found in PIK. LaShure's appeal focuses on No. 15.

### "INSTRUCTION NO. 8

"In performing professional services for a patient, a physician has a duty to use that degree of learning and skill ordinarily possessed and used by members of that profession and of that school of medicine in the community in which the physician practices, or in similar communities, and under like circumstances. In the application of this skill and learning the physician should also use ordinary care of diligence. A violation of this duty is negligence."

### "INSTRUCTION NO. 9

"In determining whether a physician used the learning, skill, and conduct required, you are not permitted to arbitrarily set a standard of your own or determine this question from your personal knowledge. On questions of medical or scientific nature concerning the standard of care of a physician, only those qualified as experts are permitted to testify. The standard of care is established by members of the same profession in the same or similar communities under like

circumstances. It follows, therefore, that the only way you may properly find that standard is through evidence presented by a physician expert witness."

### "INSTRUCTION NO. 10

"A physician who holds himself out to be a specialist in a particular field of medicine has a duty to use his skill and knowledge as a specialist in a manner consistent with the special degree of skill and knowledge ordinarily possessed by other specialists in the same field of expertise at the time of the diagnosis and treatment. A violation of this duty is negligence."

### "INSTRUCTION NO. 12

"Where, under the usual practice of the profession of the physicians, Marc Felts, M.D. and Titus Darabant, M.D., different courses of treatment are available which might reasonably be used, the physicians have a right to use their best judgment in the selection of the choice of treatment.

"However, the selection must be consistent with the skill and care which other physicians practicing in the same field in the same or similar community or specialties practicing in the same field of expertise would use in similar circumstances."

### "INSTRUCTION NO. 13

"A physician who undertakes the treatment and care of a patient and refers the patient to the patient's primary care physician for follow-up evaluation, treatment and care is not legally responsible for any negligence on the part of the patient's primary care physician."

### "INSTRUCTION NO. 15

"The law does not require that the care provided to a patient by a medical care provider be perfect. A provider is not responsible in damages for lack of success or honest mistake or errors of judgment unless it is shown that he did not exercise the reasonable care, skill and diligence used by providers in the same field of expertise under like circumstances.

"If there is more than one course of treatment that a physician could reasonably pursue, it is not negligence for the physician to adopt one of the methods even though subsequent events may show that the choice was not the best."

## We look at Instruction No. 15 and its effect.

The first paragraph of the instruction is the primary subject of our inquiry because the second paragraph is essentially a repetition of a PIK instruction already given by the court in prior instructions. Instruction No. 15 read:

"The law does not require the care provided to a patient by a medical care provider be perfect. A provider is not responsible in damages for lack of success or honest mistake or errors of judgment unless it is shown that he did not exercise

the reasonable care, skill and diligence used by providers in the same field of expertise under like circumstances.

"If there is more than one course of treatment that a physician could reasonably pursue, it is not negligence for the physician to adopt one of the methods even though subsequent events may show that the choice was not the best."

The defendants requested this instruction, citing *Natanson v. Kline*, 186 Kan. 393, 350 P.2d 1093, *decision clarified on denial of rehearing by* 187 Kan. 186, 354 P.2d 670 (1960). LaShure objected to the instruction on several grounds. The instruction was phrased in the negative; it was not a PIK instruction; it did not follow the PIK format; and it was cumulative with other instructions and was not proper to give in a misdiagnosis case.

Instruction No. 4 in *Natanson* is the ostensible source for Instruction No. 15 in this case. We do note some differences however. The instruction referred to in *Natanson* says:

" 'The law does not require that treatments given by a physician to a patient *shall attain nearly perfect results*. He is not responsible in damages for lack of success or honest mistakes or errors of judgment *unless it be shown that he did not possess that degree of learning and skill ordinarily possessed by radiologists of good standing in his community* or that he was not exercising reasonable and ordinary care in applying such skill and learning to the treatment of the patient. And if among radiologists more than one method of treatment is recognized, it would not be negligence for the physician to have adopted any of such methods if the method he did adopt was a recognized and approved method in the profession at the time and place of treatment.' " (Emphasis added.) 186 Kan. at 399.

### Prior cases cited by Natanson

None of the cases cited in *Natanson* deal with instructions, but they demonstrate a shift from a contract theory of liability in professional liability cases to modern principles of negligence. The law of professional liability in Kansas has changed over time. Professional liability originally arose as a violation of a contract covenant, implied by law. Now, we have professional liability based on breaches of duties arising from the reasonable practice of the profession. Judges must view ancient precedents with caution when instructing juries in modern cases. Thus, before we fully examine *Natanson*, we follow the historical string from contract to contemporary law.

In 1870, the law clearly sounded in contracts:

"[A physician] is never considered as warranting a cure, unless under a special contract for that purpose; but his contract, as implied in law, is, that he possesses that reasonable degree of learning, skill and experience which is ordinarily possessed by others of his profession; that he will use reasonable and ordinary care and diligence in the treatment of the case which he undertakes; and that he will use his best judgment in all cases of doubt as to the proper course of treatment." *Tefft v. Wilcox*, 6 Kan. 46, 61 (1870).

Then, in 1912, the court speaks of reasonable care and diligence by a physician using methods understood and settled by the profession and not insuring a cure:

" 'A physician is required to possess a reasonable degree of learning and skill only; he is required to exercise ordinary care and diligence in the treatment of a patient, and is not responsible for errors of judgment in matters of reasonable doubt. He does not insure a cure, and in the case of a dislocated finger, the fact that the finger does not do well under this treatment does not of itself alone show negligence on the part of the physician. All he is required to do is to use ordinary care and diligence in the treatment of the patient.' " *Sly v. Powell*, 87 Kan. 142, 151, 123 Pac. 881 (1912).

Errors of professional judgment are considered for the first time in 1919:

"A physician or surgeon cannot be held liable for the results of an honest error in judgment, if it is shown that he possesses a reasonable degree of skill and learning in medicine and surgery, and that he used ordinary skill and care in the diagnosis, operation, and treatment of the plaintiff. [Citation omitted.]" *Paulich v. Nipple*, 104 Kan. 801, 805 180 Pac. 771 (1919).

In 1923, our Supreme Court, although not using the term "negligence," approaches that field of law:

"In case of doubt as to which of two or more courses is to be pursued, he must use his best judgment. [Citation omitted.] He does not guarantee good results, and no civil liability arises merely from bad results [citations omitted], nor if bad results are due to some cause other than his treatment. [Citation omitted.] But where he fails to possess ordinary learning and skill or fails to use ordinary care and diligence, and injury results therefrom, he is liable for the injury to the patient in a civil action for damages. [Citations omitted.] These principles apply to diagnosis as well as to treatment thereafter. [Citation omitted.]" *James v. Grigsby*, 114 Kan. 627, 632, 220 Pac. 267 (1923).

Then, in 1939, the court clarifies the source of any standards of conduct by which a doctor's actions are measured but maintains the physician is not a guarantor:

"A physician or surgeon is not a guarantor of the correctness of his diagnosis or of the efficacy of the treatments prescribed [citation omitted], but he is required to exercise the degree of skill and learning ordinarily possessed and exercised under similar circumstances by the members of his profession in good standing and to use ordinary and reasonable care and diligence and his best judgment in the application of his skill to the case. [Citation omitted.]" *Riggs v. Gouldner*, 150 Kan. 727, 728, 96 P.2d 694 (1939).

Then, in 1952, the court clearly deals with negligence and a *presumption* (that no longer exists) that was recognized at the time:

"This court has recognized the general rule that a physician or surgeon is presumed to have exercised his legal duty of ordinary care and skill and, in the absence of an allegation in the petition to the contrary, it is presumed that he possesses that reasonable degree of learning and skill ordinarily possessed by members of his profession and of his school of medicine in the community where he practices, or similar communities, and that he carefully and skillfully operated on the patient. No presumption of negligence of a physician or surgeon is to be indulged from the fact of injury or adverse result of his treatment of, or operation on, the patient. [Citations omitted.]" *Cummins v. Donley*, 173 Kan. 463, 465, 249 P.2d 695 (1952).

Then, in 1957, the Supreme Court recognized advances in medical and surgical science and public policy concerns:

"The relationship between a physician and his patient, implied in law, is that he possesses that reasonable degree of learning and skill ordinarily possessed by members of his profession and of his school of medicine in the community where he practices or similar communities, having due regard for the advance in medical or surgical science at the time, and that he will use such learning and skill in his treatment of the patient with ordinary care and diligence. This rule is elementary and is founded on considerations of public policy, its purpose being to protect the health and lives of the public. A physician is not a guarantor of good results, and civil liability does not arise merely from bad results, nor if bad results are due to some cause other than his treatment. In case of doubt as to which of two or more courses is to be pursued a physician is bound to use his best judgment." *Goheen v. Graber*, 181 Kan. 107, 111-12, 309 P.2d 636 (1957).

*We list here the present-day law of professional liability.*

The transition from contract principles to negligence rules is now complete, but certain elements remain in the law. The following elements establish a medical malpractice case:

1. The physician owes the patient a duty of care and was required to meet or exceed a certain standard of care to protect the patient from injury;

2. The physician breached this duty or deviated from the applicable standard of care; and
3. The patient was injured and the injury proximately resulted from the physician's breach of the standard of care.

See *Esquivel v. Watters,* 286 Kan. 292, 296, 183 P.3d 847 (2008); *Nold v. Binyon,* 272 Kan 87, 103, 31 P.3d 274 (2001); *Delaney v. Cade,* 255 Kan 199, 202-03, 873 P.2d 175 (1994).

*We examine the instruction referred to in Natanson.*

Obviously, the Supreme Court has not remained static when dealing with cases of professional liability. But we question why appellees rely on 50-year-old dicta as the source of an instruction. In *Natanson,* the Supreme Court did not approve the legal statements *as an instruction.* In fact, in that case, the jury in a special verdict returned an answer to the court that the doctor was "not guilty" of negligence, a concept not in use today. Nevertheless, the Supreme Court reversed the judgment in *Natanson* because the trial court failed to instruct the jury about informed consent. The court, in passing, simply commented about two instructions raised in the appeal and then focused on the issue of the lack of an informed consent instruction.

Here, Instruction No. 15 changes the phrase from *Natanson* " '[t]he law does not require that treatments given by a physician to a patient shall attain nearly perfect results' " into "that the care provided a patient by a medical care provider be perfect." See 186 Kan. at 399. Perfect results in *Natanson* becomes perfect care in this case. Since no one is perfect, we must question if a physician can ever be liable under such a standard. By whom would perfection be defined?

This instruction has injected the idea of perfection into the law of professional liability that has no historical foundation. Further, we think this idea of perfect results in the *Natanson* instruction arises from the old contract law concept that a physician is not a guarantor of good results. See *Paulich v. Nipple,* 104 Kan. 801, 805, 180 Pac. 771 (1919). But none of the old cases cited in *Natanson* speak in terms of perfect care. More importantly, none of

the expert witnesses here spoke of perfect care as a standard of care applicable to this case.

Looking further into the instruction, we note the liability resulting from "lacking the degree of learning and skill" used in the *Natanson* instruction is omitted in Instruction No. 15. This omission serves to limit liability and is not accurate. With this omission, the statement conflicts with Instruction No. 8 which tells the jury "a physician has a duty to use that degree of learning and skill ordinarily possessed and used by members of that profession."

### Drafted in the negative

Instruction No. 15 is drafted in a way that tries to tell the reader what the law is not: "The law does not require . . . A provider is not responsible in damages for lack of success . . . ." Our Supreme Court has warned against the use of negative instructions. See *State v. Borman*, 264 Kan. 476, 482-83, 956 P.2d 1325 (1998).

Often, academics and judges will write in negative terms to an educated audience familiar with the subject matter. Such sentences are used to complete the reader's understanding of a particular subject because they offer shades of meaning that show subtle nuances. But negative sentences do not make good jury instructions if the aim is to provide a jury with an understanding of fundamental points of law that apply to a given case. The use of negatives with negatives is one of the language constructions that decrease a jury's understanding of an instruction. According to one psycholinguistic study, such sentences take much longer to process, and the reader must have higher language skills to understand their meaning. See Charrow and Charrow, *Making Legal Language Understandable: A Psycholinguistic Study of Jury Instructions*, Colum. L. Rev. 1306 (1979). Obviously Instruction No. 15, especially the first paragraph, contains such constructions.

### We know Instruction No. 15 was confusing to the jury.

When Instruction No. 15 is read with Instruction No. 9, confusion arises. Instruction No. 9 says: "On questions of medical or scientific nature concerning the standard of care of [a] physician only those qualified as experts are permitted to testify." Here, none

of the experts gave evidence of a perfect standard of care. What could a reasonable jury make of that? The jury asked for clarification.

The request made by the jury was: "Please clarify Instruction 15, the first paragraph." The trial judge offered no help to the jury. The judge responded: "I cannot now comment on any jury instruction." After that, the jury returned its verdict. We hold the confusing way that Instruction No. 15 was written, in negative terms, along with the insertion of the idea of perfect care, created confusion among the jurors to such an extent that reversal is required. Despite the arguments of the two doctors to the contrary, this instruction is not plainly written or easy to understand.

*We hold there is no reason to grant the doctors a directed verdict.*

On cross-appeal, the defendants contend the district court erred in not granting their motion for a directed verdict. A trial court's decision on a motion for judgment as a matter of law, under K.S.A. 60-250, is reviewed under the former directed verdict standard of review. Under this standard, the trial court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. If reasonable minds could reach different conclusions based on the evidence, the motion must be denied. The appellate court applies a similar analysis when reviewing the trial court's decision on a motion for directed verdict. *Smith v. Kansas Gas Service Co.*, 285 Kan. 33, 40, 169 P.3d 1052 (2007).

Specifically, the defendants contend LaShure's expert witness, Dr. Donnelly, did "not testify within a reasonable degree of medical certainty that Mr. LaShure's hospitalization and surgery would have been avoided if [the defendants] diagnosed infection or provided antibiotic treatment." They claim Dr. Donnelly could not testify with enough certainty that LaShure did not already have osteomyelitis when he was diagnosed by the defendants. In their view, LaShure would have wanted the same surgery and treatment for osteomyelitis at the time of the defendants' diagnoses as he later received when he was diagnosed with osteomyelitis. Because the treatment in this scenario would have been the same as what

LaShure ultimately received, and because "[a]ll of LaShure's claimed injuries flow from the fact he had surgery for osteomyelitis," the defendants assert LaShure failed to establish that the defendants' conduct was the cause of his surgery or that the defendants' conduct resulted in any damages to LaShure.

LaShure responds by contending Dr. Donnelly's failure to give specific testimony about whether LaShure had osteomyelitis at the time of the initial diagnosis is immaterial. Fixing the necessary treatment did not depend on whether LaShure had osteomyelitis at the first diagnosis. Dr. Donnelly testified that LaShure had an infected foot that likely would have improved with oral antibiotics, and LaShure asserts the defendants' failure to diagnose this infection resulted in "prolonged medical treatment, pain and suffering, and expenses."

When viewed in the light most favorable to LaShure, Dr. Donnelly's testimony appears sufficient to establish causation. He testified he did not agree the necessary treatment was dependent on whether LaShure had osteomyelitis. He testified that his opinion was that it was more likely than not that LaShure "would have gotten better with an oral antibiotic." He testified that LaShure could more probably than not have avoided surgery, the intravenous antibiotics, and installing the catheter if he had been properly examined and treated at the time of the first diagnosis.

The defendants cite testimony by Dr. Donnelly, claiming he could not opine whether LaShure had osteomyelitis at the first diagnosis and that oral antibiotics will not cure osteomyelitis. This testimony seems to undermine Dr. Donnelly's testimony that LaShure would have gotten better with an oral antibiotic. But this court's role is not to weigh conflicting evidence, evaluate witnesses' credibility, or redetermine questions of fact. *In re Estate of Hjersted*, 285 Kan. 559, 571, 175 P.3d 810 (2008). We believe that when our dissenting colleague writes the doctor's testimony "was completely undermined by the cross-examination," he engages in weighing the evidence. We must leave such tasks to the jury. Because Dr. Donnelly provided testimony that could show causation and injury, the district court did not err in overruling the defendants' motion for directed verdict.

Reversed and remanded for a new trial. Cross-appeal denied.

GREENE, J., concurring in part and dissenting in part: I concur with my colleagues' analysis on the erroneous jury instruction and the need for a new trial, but I respectfully disagree with their holding on the cross-appeal. My review of the plaintiff's expert's testimony reveals that his opinion on causation was undermined on cross-examination and that the defendants were entitled to a partial directed verdict.

This case presents a situation where the only witness supporting causation testifies on direct examination in a manner sufficient to establish causation, but his testimony on cross-examination clearly and unequivocally "delinks" most of the plaintiff's claimed damages from any negligence by the defendants. Where the plaintiff's sole causation witness is unable to support his own opinion as to causation, the result is not "conflicting" evidence that must be weighed by the factfinder, but rather a defect in proof that has legal consequences. See *Stormont-Vail Healthcare, Inc. v. Cutrer*, 39 Kan. App. 2d 1, 178 P.3d 35 (2007) (plaintiff's expert on causation disclaimed prior opinion, thus entitling defendants to summary judgment).

Here, plaintiff's fundamental claim was that the defendants misdiagnosed an infected foot as mere gout as early as June 5, 2003, thus causing the infection to worsen and resulting "in more pain, suffering, disability and accompanying mental anguish, medical bills and lost time from employment" until osteomyelitis was diagnosed and treated on June 17, 2003. The plaintiff called as his expert witness Dr. Joseph Donnelly, who supported causation on direct examination with the following testimony:

"Q. What is your opinion, sir?

. . . .

"A. I felt that [defendant Dr. Felts] had not excluded the main thing that you are concerned about when a diabetic comes in with a red foot, which is the infection, and had failed to diagnose that.

"Q. And was there any lost opportunity by reason of that that you believe had any impact on the patient?

"A. I believe the delay allowed the infection to spread, become more severe, and would have been much more easily treated sooner rather than later.

"Q. . . . Do you have an opinion as to whether any of the treatment received by Mr. LaShure could have been avoided if proper diagnosis and treatment regimen had been implemented on the June 5th —

. . . .

"A. I think, more likely than not, he would have gotten better with an oral antibiotic.

. . . .

"Q. . . . Do you have an opinion as to whether or not the surgery to his foot could have been avoided, more probably than not, had he been diagnosed and treated correctly on the night of June 5th as you've explained?
"A. Yes, I think he could have avoided that.
"Q. Could he have avoided the IV antibiotics and the installation of the Hickman catheter if he had been properly examined and treated on the night of June 5th?
"A. Yes."

Similar testimony was elicited as to the consequences of a subsequent misdiagnosis on June 8, 2003, by the codefendant. The problem with all this testimony, however, is that Donnelly admitted on cross-examination that he could *not* state within a reasonable degree of medical probability whether the plaintiff *already had osteomyelitis at the time of the initial diagnosis*. He further testified that once osteomyelitis is diagnosed, the appropriate treatment would have been the same as plaintiff received, *i.e.*, hospitalization, surgical debridement, and intravenous antibiotics. This testimony was clear and unequivocal:

"Q. Doctor, would you agree that, if a diagnosis of osteomyelitis had been made on June 6th . . . that the treatment, likely for that condition would have been hospitalization, surgical debridement and IV antibiotics?
"A. If they had diagnosed osteomyelitis on that occasion, that would have been the appropriate treatment."

Although defendants broaden their argument on appeal, their motion before the district court was for a partial directed verdict on this ground:

"[T]here was a second basis for the second motion for directed verdict—and I will acknowledge it really probably is for partial directed verdict—and that was on the basis that there was no evidence in plaintiff's case that Mr. LaShure, within a reasonable degree of medical probability, did not have osteomyelitis at the time [of the initial diagnosis] . . . , [and] that he would have had to have had surgical treatment and IV antibiotics, essentially the same treatment that he ultimately obtained.

"We would ask for a directed verdict on the basis of causation to eliminate those elements of damage from the plaintiff. And I think I indicated on the record that, candidly, I will acknowledge and an argument probably can be made that if a diagnosis of and treatment had been initiated earlier, there may have been a shorter delay from the standpoint there may have been some additional pain and suffering of the plaintiff during the eight, ten-day period of time. But that's the only element of damages that I believe the plaintiff's case at that point in time was supported from an expert testimony standpoint."

LaShure responds to the defendants' arguments on appeal by contending that Donnelly's failure to give specific testimony as to whether LaShure had osteomyelitis at the time of the initial diagnosis is immaterial, because the determination of the necessary treatment did not depend on whether LaShure had osteomyelitis at the time of the initial diagnosis. LaSure contends that Donnelly testified that LaShure had an infected foot that likely would have improved with oral antibiotics, and LaShure asserts the defendants' failure to diagnose this infection resulted in "prolonged medical treatment, pain and suffering, and expenses."

The flaw in LaShure's response is that it relies on testimony that was completely undermined by the cross-examination. If LaShure's foot infection had already advanced to osteomyelitis at the time of the initial presentment (a possibility that Donnelly could not rule out), the treatment was *not* oral antibiotics and hopeful improvement. In fact, treatment by oral antibiotics would have masked the severity of the infection, resulting in chronic osteomyelitis—an even more serious problem for the patient. Donnelly specifically stated:

"Q. And so, doctor, if Mr. LaShure had osteomyelitis on June 6th, and he had been given oral antibiotics by Dr. Felts and then Dr. Darabant continued that prescription, he may have improved his symptomatology to cellulitis, but it would not have cured his osteomyelitis; correct?
"A. Given those assumptions, yes.
. . . .
"Q. . . . If Mr. Lasure had been—had osteomyelitis, the increase in pain that he'd had in those three or four days due to the increasing edema and his bone in that confined space causing a similar exquisite pain that a person experiences with gout, and instead of making the diagnosis of gout, they had given, as you said, oral antibiotics, the oral antibiotics may have improved his symptomatology related to

his soft tissue, but it would likely then have delayed the discovery of his osteomyelitis; isn't that correct, doctor?

"A. They may have never discovered it.

. . . .

"Q. Now my question after that is, is that, therefore, what very well could have happened was to convert what you believe an acute osteomyelitis to a chronic osteomyelitis; correct?

"A. He could have developed a chronic osteomyelitis.

"Q. Yes. Because his symptomatology was masked because of the oral antibiotics; correct?

"A. That's the goal.

"Q. And tell me, would you tell the jury, doctor, what's harder to treat, acute osteomyelitis or chronic osteomyelitis?

"A. Harder in what regard?

"Q. Harder to treat to the extent of preventing amputation.

"A. I think that you would rather have an acute. Something that happens quickly will resolve more quickly, most likely. If you've had it a long time, it's going to be harder to treat.

"Q. Indeed, would you agree, doctor, a chronic osteomyelitis in indeed much more difficult to treat than acute osteomyelitis?

"A. Yes."

This testimony, viewed as a whole, and in favor of the plaintiff, does not leave room for a reasonable mind to conclude that any purported negligence of defendants caused the damages claimed by plaintiff, other than pain and suffering between June 6 and 17, 2003. In fact, in the absence of reasonable certainty that osteomyelitis was *not* present at the time of initial diagnosis, the only consequence of the failed diagnosis was some additional pain and suffering from that time until the correct diagnosis was made. In summary, unless osteomyelitis was not present on June 6 and developed *due to* improper diagnosis and treatment, the misdiagnosis did not *cause* the ultimate hospitalization and surgery.

Donnelly maintained his opinion that he did not "think" LaSure had osteomyelitis at the initial diagnosis, but his testimony was consistent that he could not say within a reasonable degree of medical certainty that osteomyelitis was not already present at that time. Expert witnesses should confine their opinions to relevant matters which are certain or probable, not those which are merely possible. *George v. Pauly*, 30 Kan. App. 2d 444, 450, 45 P.3d 1 (2001).

With due respect to my colleagues, when the sole expert on standard of care and causation in a medical malpractice case clearly and unequivocally undermines on cross-examination his or her own opinion as to causation, there is no evidence to be "weighed" by a factfinder. Weighing evidence implies conflicting testimony; here there was no conflict after the cross-examination. Where the only expert has, by his own testimony, logically defied any nexus between his opinion of negligence and most of the claimed damages, there is nothing to be weighed. I would reverse and remand for new trial, but I would limit damages on remand to the additional pain and suffering between June 6 and June 17, 2003.