(178 P.3d 35)
No. 97,217

STORMONT-VAIL HEALTHCARE, INC., *Appellee*, v. MICHELLE R. CUTRER, *Appellant*, v. TAYLOR L. PORTER, M.D., *Appellee*.

Opinion filed October 26, 2007.

*Alan V. Johnson*, of Sloan, Eisenbarth, Glassman, McEntire & Jarboe, L.L.C., of Topeka, for appellant.

*Nathan D. Leadstrom* and *Wayne T. Stratton*, of Goodell, Stratton, Edmonds & Palmer, L.L.P, of Topeka, for appellees Stomont-Vail Healthcare, Inc., and Taylor L. Porter, M.D., and *E. Lou Bjorgaard Probasco*, of Topeka, for appellee Stormont-Vail HealthCare, Inc.

Before GREENE, P.J., MALONE and LEBEN, JJ.

GREENE, J.: Michelle R. Cutrer appeals the district court's dismissal of her medical malpractice lawsuit against Dr. Taylor L. Porter and Stormont-Vail Healthcare, Inc. (Stormont-Vail), arguing that the court erred in refusing to consider her expert witness' report to controvert material facts and in awarding judgment to the defendants as a matter of law. Based upon the deposition testimony of Cutrer's expert, his preliminary report was undermined and the causal nexus of any breach of standard of care to Cutrer's purported injuries was disclaimed. Concluding Cutrer failed to controvert key material facts as to lack of causation and injury, summary judgment was appropriate. Accordingly, we affirm the district court.

## *Factual and Procedural Background*

Cutrer had a long history of depression and suicidal ideation. When she began having suicidal thoughts as a result of a broken engagement, her primary care physician prescribed 20 mg per day of Paxil beginning March 3, 2003; this dosage was subsequently increased to 40 mg per day. On March 25, 2003, Cutrer voluntarily admitted herself into the psychiatric unit at Stormont-Vail, and during her 3-day stay at the hospital, Dr. Porter switched Cutrer's medication from Paxil to Remeron. Porter tapered Cutrer off of the Paxil, ordering 20 mg per day for 3 days before completely discontinuing it in favor of Remeron.

On March 28, 2003, Cutrer was discharged from Stormont-Vail at her request with a discharge plan to continue to see her therapist, to continue receiving medication from her primary care physician, and to see a psychiatrist. Stormont-Vail's records indicate that, prior to Cutrer's release, a nurse left a message with Connie Lofgreen, Cutrer's therapist, telling Lofgreen about Cutrer's discharge plan. In addition, the hospital's records showed Cutrer told the hospital staff she had contacted Lofgreen and had set up a time for a therapy session. Lofgreen later denied knowledge of such contacts. Porter gave Cutrer a prescription for a 30-day supply of Remeron and a 30-day supply of Ambien.

Upon discharge, Cutrer had the prescriptions filled but gave the pills to her sister because her sister was not comfortable with Cutrer having so many pills in her home. The next day, Cutrer called the Stonestreet Professional Offices and talked with Dr. Elizabeth Hatcher. Hatcher told Cutrer there was a risk to discontinuing Paxil and that Cutrer should take 30 mg of the drug on Saturday and 30 mg on Sunday, but Cutrer took more pills than the prescribed dosage because she wanted to sleep. On Sunday, she went to her sister's house and picked up the next week's dosage of Remeron and Ambien. She then took a number of Ambiens, seven Remerons, and some over-the-counter sleeping pills because she wanted to kill herself, but Cutrer later expressed some confusion over exactly how many and which pills she took.

On March 30, 2003, Lofgreen called Stormont-Vail to check up on Cutrer. After learning that Cutrer had been discharged, Lofgreen called her at home. During their conversation, Lofgreen realized Cutrer was "under the influence," called Cutrer's sister, and told her to take Cutrer to the emergency room. Cutrer's father took her to the emergency room where she was kept under observation, but the hospital did not pump her stomach because it had been too long since she had overdosed. The hospital released her after a 1-hour stay with instructions to stay at her father's and to see her therapist in the morning.

In late November 2004, Stormont-Vail brought a collection suit against Cutrer seeking $2,758, apparently for services during her hospitalization. Cutrer answered and brought a medical malprac-

tice counterclaim against both Porter and Stormont-Vail, alleging damages "in the form of pain and suffering, emotional distress and mental anguish, and additional medical expenses as well as economic losses." Specifically, Cutrer claimed the hospital breached its duty of reasonable care by "failing to place [her] on the proper taper-phase regimen for Paxil" and by "sending [her] home with two months worth of medication, and by failing to advise her therapist of her discharge." She claimed Porter breached his duty of reasonable care by "abruptly taking [her] off Paxil, and by failing to place [her] on the proper taper-phase regimen for Paxil," and by "sending [her] home with two months worth of medication, thus endangering her life."

In support of these claims, Cutrer hired Dr. William S. Logan to prepare an expert report. Logan's report found that Stormont-Vail and Porter breached their standard of care in their treatment of Cutrer. It stated: "It is my opinion with a reasonable medical certainty that the abrupt discontinuation of Paxil caused or contributed to Ms. Cutrer's overdose . . . ." In addition, the report stated Porter did not follow the community standard of care through his inadequate suicide assessment; his failure to coordinate her care with her therapist; his excessive prescription of Remeron; his failure to properly taper Paxil; and his failure to inform Cutrer of the risks of tapering her from Paxil. The report also opined that Stormont-Vail breached its duty of care by failing to correct or monitor any of Porter's errors. In conclusion, Logan wrote: "[T]his is a situation that could have easily been avoided if proper treatment had been followed."

In response to this report, Stormont-Vail deposed Logan and, as discussed in detail below, Logan essentially disavowed much of his report and either disclaimed or failed to opine as to any causal nexus between any breach of the standard of care and Cutrer's injuries. Stormont-Vail and Porter then filed a motion for summary judgment. After briefing and argument, the district court reviewed Logan's report, but relied "primarily" on Logan's deposition testimony for purposes of the motion. Ultimately, the court found that Logan's testimony on the issue of causation was insufficient to defeat the motion for summary judgment. Cutrer timely appeals.

Prior to oral argument before this court, Stormont-Vail and Porter advised this court Cutrer had filed for bankruptcy protection and there was a "substantial question" whether this appeal should be stayed. Following a show cause order issued by this court, Cutrer advised that the trustee in bankruptcy was contacted and that he "does not desire to have this appeal stayed or abandoned." Accordingly, we proceed to decide the appeal and issue our opinion. See *Golconda Screw, Inc. v. West Bottoms Ltd.*, 20 Kan. App. 2d 1002, 1003, 894 P.2d 260 (1995).

### Did the District Court Err in Refusing to Consider a Report of Cutrer's Expert Witness?

The district court noted that the Logan report was not of evidentiary value and that the court would "primarily" consider the subsequent deposition in deciding the summary judgment motion.

"Although the Court has reviewed Dr. Logan's expert report, it is important to recognize that it was not signed under oath and it would not be admissible evidence at trial. See K.S.A. 60-460. Moreover, an expert report is not listed in either K.S.A. 60-256 or Kansas Supreme Court Rule 141 as one of the items which must be considered in determining whether there is a genuine issue of material fact. Thus, in deciding whether the Counterclaim Plaintiff has come forward with admissible evidence regarding the essential element of causation in this case, the Court will primarily look to the deposition of Dr. Logan."

To the extent that the district court relied upon statutory law and binding rules of our Supreme Court in determining whether the expert report should be considered, the question framed is subject to de novo review. This court reviews the interpretation of a statute as a question of law, using a de novo standard. *State v. Franklin*, 280 Kan. 337, 341, 121 P.3d 447 (2005). When the district court's ruling hinges on an interpretation or application of the Supreme Court Rules, we exercise independent appellate review. *Gerhardt v. Harris*, 261 Kan. 1007, 1010, 934 P.2d 976 (1997).

At the outset, we note Stormont-Vail's argument that the district court "either did or could have excluded the report due to the limiting testimony given by Dr. Logan in his deposition." We agree. Whether or not the report was technically subject to consideration for purposes of summary judgment, our comparison of the report

to the deposition testimony has convinced us that the only opinion of causation contained in the expert report was completely disavowed in the subsequent deposition. We view Cutrer's reliance on the disavowed report as akin to an attempt to modify deposition testimony with an affidavit for purposes of summary judgment, a practice long ago prohibited. *Dawson v. Prager*, 276 Kan. 373, 385-86, 76 P.3d 1036 (2003); *Mays v. Ciba Geigy Corp.*, 233 Kan. 38, 661 P.2d 348 (1983). Based on this view, the district court properly refused to consider the report under these circumstances and reached the right result in any event. See *Corder v. Kansas Board of Healing Arts*, 256 Kan. 638, 658-59, 889 P.2d 1127 (1994).

We also agree with the district court in its apparent conclusion that the expert report was not subject to "primary" consideration for the purposes of summary judgment. The district court was obviously concerned about the lack of any sworn testimony or affidavit incorporating or supporting the report; most authorities share such a concern. See, *e.g.*, *Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1371 (D. Kan. 1996), *aff'd* 145 F.3d 1347 (10th Cir. 1998) (disregarding an expert report in ruling on a motion for summary judgment, reasoning that the party could have and should have set out material opinions in affidavits or sworn testimony); see also *Fowle v. C & C Cola*, 868 F.2d 59, 67 (3d Cir. 1989) ("The substance of this report was not sworn to by the alleged expert. Therefore, [it] is not competent to be considered on a motion for summary judgment."); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n.17, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970) ("This statement, being unsworn, does not meet the requirements" of Rule 56[e]); *Proctor v. Sagamore Big Game Club*, 265 F.2d 196, 199 (3d Cir.), *cert. denied* 361 U.S. 831 (1959) ("These self-serving unverified statements of fact . . . are not the type of proof which [Rule 56] requires for the resolution of a motion for summary judgment."); *Johnson v. Resources for Human Development*, 878 F. Supp. 35, 39 n.5 (E.D. Pa. 1995) (rejecting unsworn letters as evidence in opposition to a summary judgment motion).

K.S.A. 60-256(c) clearly provides that a summary judgment decision "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the

affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." The statute essentially requires the court to consider matters of evidentiary value and references evidentiary materials that are generally verified or made under oath. Logan never verified or affirmed his report under oath, never filed an affidavit confirming the accuracy of his report, and never testified by deposition or otherwise that the report was accurate and complete. When Logan was questioned in the deposition about his prior report, he generally disavowed many of the opinions contained therein and reiterated that his report was "preliminary." We agree with the district court in concluding that the subsequent deposition was the better source of reliable evidence for purposes of summary judgment. The district court did not err in looking "primarily" to the subsequent deposition rather than the unverified and unsworn preliminary report in deciding the summary judgment motion.

### Did the District Court Err in Granting Summary Judgment For Porter?

Cutrer next argues the district court erred in granting summary judgment for Porter. We review the district court's determination pursuant to the well-established standard:

" ' " " 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' [Citations omitted.]" ' " *Korytkowski v. City of Ottawa*, 283 Kan. 122, 128, 152 P.3d 53 (2007).

In order to establish medical malpractice, Cutrer was required to demonstrate the same elements of proof as in a negligence action. See *Hare v. Wendler*, 263 Kan. 434, 440, 949 P.2d 1141

(1997). Cutrer was required to establish: (1) Porter owed her a duty of care and was required to meet a certain standard of care; (2) Porter breached this duty; (3) she was injured; and (4) this injury was caused by the breach of the standard of care. See *Nold v. Binyon*, 272 Kan. 87, 103, 31 P.3d 274 (2001). "Expert testimony is required in medical malpractice cases to establish the applicable standard of care and to prove causation." *Watkins v. McAllister*, 30 Kan. App. 2d 1255, 1258, 59 P.3d 1021 (2002).

Here, the district court focused on the issue of causation and concluded:

"The Court does not find any testimony which would be sufficient to establish within a reasonable degree of medical probability that an alleged deviation of the standard of care by the Counterclaim Defendants caused the injuries or damages which are claimed by the Counterclaim Plaintiff in this case."

Although Cutrer has urged us to focus on the details of each of the alleged breaches of the standard of care, we view these purported breaches through the lens of causation. Our examination of the Logan deposition reveals that the expert expressed significant doubt on the threshold question of which drug was overdosed (Remeron or Paxil); in fact, Logan admitted that he "didn't come to any definite conclusion about what she took or when." Logan admitted there was a "fair discrepancy" in the various reports of what drugs may have been taken by Cutrer on March 29, 2003. Moreover, the evidence demonstrates there was likely no abrupt discontinuation of Paxil to have caused the suicide attempt. Cutrer's and Porter's depositions clearly establish that she was to continue taking Paxil through at least March 29 and had Paxil on hand. It seems undisputed that Dr. Hatcher told Cutrer to take 30 mg of Paxil on both March 28 and 29, while advising Cutrer of a risk of discontinuing the drug. Logan ultimately admitted in his deposition that if Cutrer "actually got the medicine," there was no discontinuation. When pressed, Logan admitted his prior opinion of Paxil discontinuation was "an assumption." Even if we view the evidence in the light most favorable to Cutrer, we find no testimony sufficient to defeat the summary judgment challenge of the defendants.

Most telling, however, is the fact the Logan deposition testimony backs away from any opinion of causation and damages. That tes-

timony included the following key excerpts bearing on causal nexus:

"[Y]ou seem to be approaching it as if I'm saying this serotonin discontinuation syndrome is somehow responsible for her overdose or her attempted suicide. *I'm not saying that at all. I don't know that those two are necessarily connected,* and if they are connected it's not a direct causal result of any selective serotonin withdrawal symptom, but only perhaps a response of someone who was already pretty depressed and had suicidal thoughts to maybe some increased agitation from dropping off the medicine fairly quickly. But that would be the only connection that I would see between those two things." (Emphasis added.)

"Well, at any rate, I just thought that the—from what I was able to read that the abrupt Paxil discontinuation did agitate her, or at least was a potential cause for her increased agitation, certainly not the only cause, and was—in the sense that it may have caused some increased agitation contributed to her overdose. *Certainly not the only reason, and maybe not even the principal reason."* (Emphasis added.)

"[T]here's virtually no chance that she would have killed herself in this manner. And the family also intervened and reduced the risk by confiscating all but a week's worth of her medication, so basically, you know, I haven't examined her, but you know, one of the things that's essential for a malpractice claim is the issue of damages, and *from what I could tell there really wasn't any damages, at least nothing of major significance."* (Emphasis added.)

Regarding the allegation that Porter breached the standard of care by failing to adequately "taper-off" the Paxil drug regimen, Logan's deposition testimony is not sufficient to survive a summary judgment challenge. " 'Expert witnesses should confine their opinions to relevant matters which are certain or *probable,* not those which are merely possible.' " (Emphasis added.) *George v. Pauly,* 30 Kan. App. 2d 444, 450, 45 P.3d 1 (2001). Because Cutrer's expert witness could not state it was probable that her suicide attempt was caused by Porter's abrupt discontinuation of Paxil, the district court correctly found Cutrer had not shown a genuine issue of material fact as to causation.

Regarding the allegation that Porter deviated from the proper standard of care because he did not inform her of the risks involved in discontinuing Paxil, Cutrer has cited no testimony that establishes a causal link between this purported breach and her alleged injuries. Given rather clear testimony that Dr. Hatcher advised

Cutrer of the risk of Paxil discontinuance, the testimony referenced above establishing no likely abrupt discontinuation of Paxil, the uncertainty as to the drug overdosed, and the Logan testimony regarding the lack of damages therefrom, Cutrer's allegation of deviation from standard of care due to failure to inform of the risks of discontinuing Paxil has no causal link to any of the subsequent events. Ultimately, Logan essentially volunteered that the basis for his "preliminary" opinion on this issue was not "real clear."

"Q. Well, you also mention [in your report] failure to inform the patient of the risk of abrupt discontinuation of Paxil.

"A. Once again, if you look at the damage issue, however, Dr. Hatcher informed her of that—

"Q. Yeah.

"A. —less than a day after discharge.

"Q. And if—

"A. And she may have been advised to continue at least Paxil, 20 milligrams for a couple of more days in the hospital but I don't—the record, again, on that's, you know, not real clear."

Regarding the allegations that Porter breached his duty of care by providing her with too much Remeron, there is simply no clear evidence that her supply of this drug caused any injury. Her family took a majority of the pills away from her to prevent a situation just like the one which occurred. In addition, Cutrer initially said she took only seven of the Remeron capsules, a week's supply, but was ultimately uncertain of the number or identity of drugs taken. Clearly, she had Paxil on hand, admitted taking it on the date in question, and had been told to take it to avoid any negative results from discontinuation. In fact, as discussed above, there was such a "discrepancy" in the various reports of the suicide attempt that the physicians were unable to determine whether the drug overdosed was Remeron or Paxil. Again, the record does not support causation in any event. Without any evidence of an injury caused by this alleged breach in the standard of care, summary judgment was appropriate.

Finally, regarding the allegations that Porter breached his duty of care by failing to adequately assess Cutrer's suicide risk, Cutrer presented no evidence that an improper suicide assessment caused

Cutrer's alleged injuries. Here, as in other areas of his deposition, Logan backed away from his report by suggesting that he really did not know what Porter "did or did not do," stating, "I can't, you know, tell you what may have been behind the documentation." Most importantly, however, is that whether or not Cutrer's suicide risk was adequately assessed, "from what he could tell, there really wasn't any damages, at least nothing of major significance" resulting from the suicide attempt. This claim of deviation from the standard of care did not deserve to survive the summary judgment challenge.

### Did the District Court Err
### in Granting Summary Judgment for Stormont-Vail?

Cutrer next claims the district court erred in dismissing her claims against Stormont-Vail. She argues that Stormont-Vail did not adequately make a discharge plan and it did not coordinate her care with her family or with her therapist.

As with the allegations against Porter, expert testimony was required to establish the hospital breached its duty of care. See *Watkins*, 30 Kan. App. 2d at 1258. Logan testified Stormont-Vail breached no duty to cause Cutrer's alleged injuries. In fact, in his deposition Logan disclaimed his report's preliminary conclusion.

"Q. Is there anything that you believe Stormont-Vail did or failed to do that deviated from the standard of care so as to cause any injury to this lady?

"A. Well, if you add the phrase so as to cause any injury to her, the extent of the injury that I could determine, you know, without an interview of Michelle Cutrer, of course, is that, you know, it exposed her to some increased distress perhaps on Saturday and Sunday or Friday night and Saturday, and that's about it.

"Q. Well, what did the hospital do that caused that?

"A. Right. To go to that issue, basically, *I didn't see anything that the hospital did.*" (Emphasis added.)

Without evidence of causation, Cutrer's medical malpractice claim against Stormont-Vail cannot survive a summary judgment challenge. We conclude the district court correctly dismissed the action against both Stormont-Vail and Dr. Porter.

Affirmed.