FILED
United States Court of Appeals
Tenth Circuit

April 3, 2013

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

THEA PORTENIER, Mother and next
friend of minor E.P.,

Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellee.

No. 11-3371
(D.C. No. 5:09-CV-04163-JAR)
(D. Kan.)

ORDER AND JUDGMENT[*]

Before **HARTZ**, **MURPHY**, and **HOLMES**, Circuit Judges.

Plaintiff-Appellant Thea Portenier, mother and next friend of minor E.P.

("EP"),[1] appeals from the district court's grant of summary judgment to the

government on her medical malpractice claim brought on behalf of EP pursuant to

the Federal Tort Claims Act ("FTCA") and governed by Kansas tort law. Ms.

Portenier asserts that certain healthcare professionals did not properly diagnose

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

[1] According to the complaint, Ms. Portenier legally adopted EP after the events at issue in this appeal had transpired.

and treat EP's child abuse and that this failure caused EP to suffer severe injuries from a subsequent episode of abuse. This appeal requires us to decide whether Kansas law imposes a legal duty on healthcare professionals—as part of their duty to diagnose and treat patients who have suffered child abuse—to report that child abuse to authorities or take measures to prevent a subsequent episode of child abuse from occurring. Because we conclude that Kansas law does not recognize such a duty, Ms. Portenier's medical malpractice claim cannot succeed. Accordingly, we affirm the district court's grant of summary judgment to the government.

**I**

**A**

We briefly set forth the very limited factual background necessary to the disposition of this appeal. EP was born on December 29, 2003, at Irwin Army Community Hospital ("IACH") in Fort Riley, Kansas. Shortly after giving birth to EP, his biological mother, Shirlynne Craddock, placed him in the care of her neighbor, Holly Bellinger.

On January 15, 2004, EP was taken to IACH for a scheduled visit. He was examined by several persons, most notably Captain Wayne Darsow, a family nurse practitioner, and Dr. Thomas Talbot; both noticed that EP had bruising in multiple locations. Although Captain Darsow and Dr. Talbot had some suspicions that the bruising was evidence of abuse, Dr. Talbot eventually concluded that the

bruising was most likely caused by a blood disorder. Dr. Talbot requested a follow-up examination, and EP was discharged at that time from the hospital. However, a follow-up examination never occurred.

According to the complaint, on January 29, 2004, Ms. Bellinger brought EP to Geary County Community Hospital where he was found to have, among other injuries, multiple fractures to his skull and permanent brain damage. The complaint alleges—and the parties do not dispute—that these injuries were caused by Ms. Bellinger's abuse.

**B**

Ms. Portenier brought this suit on behalf of EP against the government—i.e., the employer of Dr. Talbot and Captain Darsow—to recover damages for the severe injuries EP sustained from Ms. Bellinger's abuse following his January 15 examination at IACH. In her initial complaint, Ms. Portenier alleged two claims: medical malpractice and failure to report child abuse. She subsequently abandoned her failure to report child abuse claim and went forward solely with her medical malpractice claim. This claim was predicated on the legal duty that the healthcare professionals owed to EP to properly diagnose and treat his child abuse during the January 15 examination. Ms. Portenier asserted that had the healthcare professionals complied with this duty, EP would not have sustained the injuries caused by Ms. Bellinger's subsequent abuse.

The government moved for summary judgment on Ms. Portenier's medical malpractice claim, and the district court granted the motion. The district court rejected Ms. Portenier's contention that her medical malpractice claim involve only the duty to diagnose and treat EP's injuries and in no way relied on a duty to report child abuse. Because Ms. Portenier "claim[ed] that the healthcare professionals not only had the duty to diagnose and treat [EP's] immediate medical condition but also had a duty to diagnose the nonmedical cause of the injuries and report the injuries so that further abuse by Ms. Bellinger could be prevented," the district court concluded that "whether Dr. Talbot and Captain Darsow had a duty to report child abuse [was] necessarily at issue in this case." Aplt. App., Vol. I, at 131 (Dist. Ct. Mem. & Order, filed Dec. 7, 2011).

In the end, the district court concluded that Kansas law does not impose on healthcare professionals a duty to report child abuse as part of their duty to diagnose and treat their patients. The district court noted that, although healthcare professionals have a statutory duty to report child abuse, the Kansas Supreme Court in *Kansas State Bank & Trust Co. v. Specialized Transportation Services, Inc.*, 819 P.2d 587, 604 (Kan. 1991), held that the child abuse reporting statute does not create individual liability for noncompliance.

Moreover, the district court concluded that Kansas has not recognized a duty to report child abuse at common law and reasoned that it would not likely do so for three reasons: first, several other jurisdictions have found that healthcare

-4-

professionals do not have a common law duty to report child abuse; second, Kansas common law does not impose a duty to prevent a third party from injuring another unless there exists a special relationship between the actor and the third party or injured person, which the district court concluded was not present here; and third, the court in *Kansas State Bank & Trust*, while not directly reaching the issue, intimated that there is no common law duty to report child abuse.

Because Ms. Portenier's medical malpractice claim necessarily relied on a duty to report child abuse, and Kansas law does not recognize such a duty, the district court concluded that her claim failed as a matter of law. Summary judgment was entered for the government, and this appeal followed.

**II**

We must decide whether the district court properly granted summary judgment to the government on Ms. Portenier's medical malpractice claim. To do so, we review the district court's grant of summary judgment de novo, applying the same standards as the district court. *See e.g.*, *Kan. Penn Gaming, LLC v. HV Props. of Kan., LLC*, 662 F.3d 1275, 1284 (10th Cir. 2011). Additionally, "[w]e review the district court's determinations of state law de novo." *Ayala v. United States*, 49 F.3d 607, 611 (10th Cir. 1995).

Ultimately, we conclude that the district court correctly ruled that Ms. Portenier's claim necessarily relies on the existence of a duty for healthcare professionals to report child abuse or to take measures to prevent future episodes

of abuse caused by third parties.  Because we find that no such duty exists under Kansas law, Ms. Portenier's FTCA claim must fail.  Accordingly, we affirm the district court's grant of summary judgment to the government.

**A**

We begin with a brief overview of the FTCA.  Generally, "[t]he United States can be sued only to the extent that it has waived its immunity [from suit]." *Harvey v. United States*, 685 F.3d 939, 946 (10th Cir. 2012) (quoting *United States v. Orleans*, 425 U.S. 807, 814 (1976)) (internal quotation marks omitted). "The FTCA . . . was designed primarily to remove the sovereign immunity of the United States from suits in tort."  *Levin v. United States*, 568 U.S. ----, 133 S. Ct. 1224, 1228 (2013) (quoting *Richards v. United States*, 369 U.S. 1, 6 (1962)) (internal quotation marks omitted).  "[It] gives federal district courts exclusive jurisdiction over claims against the United States for 'injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission' of federal employees acting within the scope of their employment."[2]  *Id.* (quoting 28 U.S.C. § 1346(b)(1)).

"[T]he FTCA makes the United States liable 'to the same extent as a private individual under like circumstances.'"  *Id.* (quoting 28 U.S.C. § 2674); *see*

---

[2]    The parties do not dispute that suit against the United States is proper because Dr. Talbot and Captain Darsow are federal employees who were working within the scope of their employment at all relevant times. *See Levin*, 133 S. Ct. at 1228.

*Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1117 (10th Cir. 2004) ("The FTCA provides that the United States shall be liable under state tort law only in the same manner and to the same extent as a private individual under like circumstances." (quoting *Nationwide Mut. Ins. Co. v. United States*, 3 F.3d 1392, 1396 (10th Cir. 1993)) (internal quotation marks omitted)). "State substantive law applies to suits brought against the United States under the FTCA." *Hill*, 393 F.3d at 1117. The governing state law is "the law of the place where the act or omission occurred." *Esposito v. United States*, 368 F.3d 1271, 1274 (10th Cir. 2004) (quoting 28 U.S.C. § 1346(b)(1)) (internal quotation marks omitted); *see Levin*, 133 S. Ct. at 1228. "Even if specific behavior is statutorily required of a federal employee, the government is not liable under the FTCA unless state law recognizes a comparable liability for private persons." *Ayala*, 49 F.3d at 610; *see Klepper v. City of Milford*, 825 F.2d 1440, 1448 (10th Cir. 1987) ("It is well established that where a negligence claim is based on a violation of a federal statute or regulation, no claim will lie under the FTCA in the absence of some other duty under the applicable state law.").

Here, the acts at issue all occurred in Kansas; consequently, Kansas supplies the controlling law for Ms. Portenier's medical malpractice claim. Under Kansas law, "[m]edical malpractice is negligence of a healthcare professional in the diagnosis, care, and treatment of a patient." *Munoz v. Clark*, 199 P.3d 1283, 1288 (Kan. Ct. App. 2009) (quoting *Perkins v. Susan B. Allen Mem'l Hosp.*, 146

P.3d 1102, 1105 (Kan. Ct. App. 2006)) (internal quotation marks omitted). A medical malpractice claim requires proof of the following:

> (1) the health care provider owed the patient a duty of care, which required that the provider meet or exceed a certain standard of care to protect the patient from injury; (2) the provider breached that duty or deviated from the standard of care; (3) the patient was injured; and (4) the injury proximately resulted from the health care provider's breach of the standard of care.

*Foster ex rel. Foster v. Klaumann*, 294 P.3d 223, 229 (Kan. 2013); *accord Puckett v. Mt. Carmel Reg'l Med. Ctr.*, 228 P.3d 1048, 1060 (Kan. 2010) (setting forth the same four elements); *see also Hale v. Brown*, 197 P.3d 438, 440 (Kan. 2008) ("In order to establish a negligence claim, the plaintiff must establish the existence of a duty, a breach of that duty, an injury, and proximate cause . . . .").

"Whether a physician owes a legal duty to a patient under a particular circumstance is a question of law." *Irvin v. Smith*, 31 P.3d 934, 942 (Kan. 2001); *see Woodruff v. City of Ottawa*, 951 P.2d 953, 956 (Kan. 1997) ("Whether a duty . . . exists is a question of law."); *Calwell v. Hassan*, 925 P.2d 422, 428 (Kan. 1996) ("Whether a duty exists is a question of law."). "[T]he fact that a plaintiff produces an expert witness who will testify that a particular act or omission constitutes 'a departure from the standard of care' [does not] establish that a duty exists as a matter of law." *Irvin*, 31 P.3d at 942.

Kansas law imposes a statutory duty on healthcare professionals who have reason to suspect that a child has been abused to report the suspected abuse to the

-8-

State.  *See* Kan. Stat. Ann. § 38-2223 (2012).  However, as noted by the district court, the Supreme Court of Kansas held that this statute does not create a private right of action against those who fail to comply.[3]  *See Kan. State Bank & Trust*, 819 P.2d at 604 ("There is no express indication of legislative intent to impose any liability for failure to report."); *see also Adams v. Bd. of Sedgwick Cnty. Comm'rs*, 214 P.3d 1173, 1188 (Kan. 2009) ("[In *Kansas State Bank & Trust*,] this court rejected the argument that the child abuse reporting statute created a duty owed to a subsequently abused child.").  Notably, Ms. Portenier recognizes that Kansas law is postured in this manner and that the district court was correct in finding that healthcare professionals do not have a statutory duty to report child abuse that is actionable under Kansas tort law.

Further, under Kansas common law, the "prevailing rule . . . is that in the absence of a 'special relationship,' there is no duty of an actor . . . to control the conduct of a third person . . . to prevent harm to another." *D.W. v. Bliss*, 112 P.3d 232, 239 (Kan. 2005); *see Calwell*, 925 P.2d at 428–29.  "A special relationship may exist between parent and child, master and servant, the possessor of land and licensees, persons in charge of one with dangerous propensities, and persons with custody of another." *Calwell*, 925 P.2d at 428–29 (quoting *C.J.W. v.*

---

[3]      At issue in *Kansas State Bank & Trust* was an earlier codification of the child abuse reporting statute, Kan. Stat. Ann. § 38-1522 (1990).  *See* 819 P.2d at 602–03.  The statute was later recodified as Kan. Stat. Ann. § 38-2223.

*State*, 853 P.2d 4, 9 (Kan. 1993)) (internal quotation marks omitted); *see Bliss*, 112 P.3d at 239 (listing the same types of special relationships). Once again, Ms. Portenier recognizes that this is the law in Kansas and does not contend that a special relationship exists in this case.

**B**

We begin our analysis by reiterating for clarity what is not disputed by the parties. Next, we set forth the contours of Ms. Portenier's argument, concluding that her claim necessarily relies on healthcare professionals having a duty to report child abuse or take measures to prevent their patients from being harmed by third parties as part of their duty to treat their patients. Finally, we conclude that because Kansas law has not recognized such a duty, nor would it, Ms. Portenier's claim must fail.

Beginning with what the parties do not dispute, the district court held that Kansas common law "does not recognize a cause of action for medical negligence based on failure to report child abuse." Aplt. App., Vol. I, at 134. On appeal, Ms. Portenier made clear that she "does not dispute that the District Court was correct in that statement of law." Aplt. Opening Br. at 31. Similarly, Ms. Portenier does not contest that the healthcare professionals here cannot face liability in a private action under Kansas's child abuse reporting statute for failing to report abuse. The district court also held that, under Kansas law, "an actor has no duty to control the conduct of a third party to prevent that person from causing

-10-

harm to others unless there is a special relationship between the actor and the third party or the actor and the injured party." Aplt. App., Vol. I, at 134 (quoting *Bliss*, 112 P.3d at 238) (internal quotation marks omitted). This too is undisputed by Ms. Portenier.

Ms. Portenier's position, however, is that these legal determinations are irrelevant because her claim is not that healthcare professionals have a duty to report child abuse or a duty to protect their patients from harm caused by third parties. Instead, says Ms. Portenier, her claim is one of medical malpractice, and if EP's healthcare professionals had properly diagnosed and treated his condition—traumatic child abuse[4]—he would not have sustained the injuries subsequently caused by Ms. Bellinger. According to Ms. Portenier, she can prove her medical malpractice claim by showing that the healthcare professionals misdiagnosed EP's child abuse as a blood condition. Had they not done so, Ms. Portenier continues, the standard of care for the treatment of child abuse—as testified to by her experts and established in the Department of Army's Protocol for Child Abuse and Neglect ("PCAN")—would have required the healthcare professionals to report the child abuse or take preventative measures to ensure that no further abuse occurred.

---

[4] Because the parties both proceed under the assumption that child abuse is a medical condition that healthcare professionals have a duty to non-negligently diagnose and treat, we accept that premise (without definitively opining on it) for purposes of this appeal.

Despite her protestations to the contrary, however, Ms. Portenier's claim rests on more than an alleged misdiagnosis of EP's injuries during the January 15 examination; it rests on the additional premise that had the alleged misdiagnosis not occurred, the healthcare professionals would have had a duty to report the child abuse or take measures to prevent further abuse from occurring as part of their duty to treat the abuse. The language of Ms. Portenier's own arguments demonstrate that this is true. For example, she argues:

> [A] diagnosis [of child abuse] triggers two protocols. The first is the duty to complete a thorough evaluation of the baby's condition to determine not only the injuries but also their cause. The second is *a duty to alert authorities*, but this follows only after the healthcare evaluation is completed. If the medical evaluation required by the infant's condition is not made, injuries are not treated *and the protective protocols cannot be implemented*. The purpose of *the duty*—of the standard of care—is to *prevent future injury to the baby*.

Aplt. Opening Br. at 30 (emphases added); *see id.* at 34 ("[Ms. Portenier's] complaint alleges negligence in the failure to make an accurate and timely diagnosis and institute treatment, which would have *included* hospitalization and *removal from the abusive custodian*." (emphases added)).[5] Put differently, Ms.

_____

[5] Ms. Portenier made nearly identical arguments before the district court. *See, e.g.*, Aplt. App., Vol. I, at 68 (Pl.'s Resp. to Def.'s Mot. to Dismiss or in the Alternative, Mot. for Summ. J., filed July 5, 2011) ("In addition to showing . . . that E.P.'s health care providers had a duty to properly diagnose suspected child abuse, [Ms. Portenier] will show . . . that [they] had a duty to timely *treat* the suspected child abuse, *which includes taking the necessary steps to safeguard the victim to prevent further immediate abuse*." (second emphasis added)); *id.* at

(continued...)

-12-

Portenier argues that the duty to diagnose and treat "include[s]" removing the patient "from the abusive custodian," *id.*, and that the "purpose of the duty" is to prevent further abuse by the third-party abuser,[6] *id.* at 30. These arguments make it clear that Ms. Portenier's claim necessarily relies on the existence of a duty of healthcare professionals to report child abuse or take steps to prevent a third party from subsequently abusing their patient as part of their duty to treat child abuse.[7]

---

[5](...continued)
89 ("[I]f Captain Darsow and Dr. Talbot had followed the accepted standard of medical care, they would have made the proper diagnosis . . . [of] child abuse. They then would have followed the accepted standard of medical care in *reporting their diagnosis of child abuse . . . .*" (emphasis added)).

[6]    That Ms. Portenier seeks to impose a duty on healthcare professionals to prevent subsequent injuries to their patients caused by third parties is further bolstered by considering the injuries for which she seeks to hold the healthcare professionals liable—*viz.*, injuries caused by Ms. Bellinger *after* EP's January 15 visit to IACH.

[7]    Ms. Portenier argues that the failure to diagnose child abuse, which could lead to further abuse of the child, is no different than the failure to diagnose any other healthcare condition that could lead to further injuries on account of the undiagnosed condition. To demonstrate this, she relies on two hypothetical situations that she contends are analogous to her claim. But these hypothetical situations only serve to demonstrate that her claim is legally distinct from medical malpractice claims recognized by Kansas. First, she states:

> When an emergency room physician fails to do cardiac enzymes and misses an impending myocardial infarction, the physician does not actually cause the fatal injury—a glob of fatty plaque does that—but physicians are routinely held accountable for the failure to diagnose the impending myocardial infarction because with timely treatment the injury is avoided; no different rule should apply here.

(continued...)

Aplt. Opening Br. at 40 n.9. But unlike the cause of the eventual injuries in a typical medical malpractice claim—or, more specifically, the hypothetical glob of fatty plaque in Ms. Portenier's hypothetical—the cause of EP's eventual injuries was the conduct of a third party, i.e., Ms. Bellinger, *not* an untreated medical condition running its course. In other words, Ms. Portenier does not contend that the injuries themselves present at the January 15 examination, if left untreated, would have caused EP's subsequent injuries. She acknowledges that Ms. Bellinger inflicted these injuries, and Kansas law clearly distinguishes between injuries caused by third parties and those that are not. *See Bliss*, 112 P.3d at 239 ("[The] prevailing rule in Kansas is that in the absence of a 'special relationship,' there is no duty of an actor . . . to control the conduct of a third person . . . to prevent harm to another . . . .").

Her second hypothetical further demonstrates why the duty she seeks to impose on healthcare professionals is unique:

> When a patient comes to the Emergency Room after automobile trauma, he presents with a medical condition—trauma—that has a non-medical cause. If the patient has a ruptured aorta, and that is missed in the diagnosis, and the patient later exsanguinates as a result, the "non-medical cause" of the patient's injuries will not prevent the physician from being liable for the patient's death . . . .

Aplt. Reply Br. at 4–5. It is true that a patient injured in a car accident and a patient injured due to child abuse both suffered injuries having, in Ms. Portenier's words, a "non-medical cause." And it is further true that healthcare professionals have a duty to non-negligently diagnose and treat patients presenting these types of injuries. *See, e.g.*, *Monoz*, 199 P.3d at 1288. But Ms. Portenier's second hypothetical departs from the instant case in that the duty to diagnose and treat does not require healthcare professionals to take measures to prevent the "non-medical cause" from recurring. Put differently, absent a special relationship, Kansas law does not place a duty on healthcare professionals to take steps to prevent a *subsequent* car accident any more than it requires them to take steps to prevent a *subsequent* episode of child abuse, as healthcare professionals have no duty to control the conduct of third parties. *See Bliss*, 112 P.3d at 239. Thus Ms. Portenier's attempt to equate her claim to that of an ordinary medical malpractice

(continued...)

-14-

Ms. Portenier seeks to avoid this conclusion at least in part through an argument that misguidedly conflates the distinct—but related—concepts of duty and standard of care. *See, e.g.*, Aplt. Opening Br. at 30 ("The purpose of the duty—of the standard of care—is to prevent future injury to the baby."). Having already purportedly established the existence of the requisite legal duty for purposes of prosecuting her claim—*viz.*, the overarching duty to diagnose and treat traumatic child abuse—Ms. Portenier reasons that she may direct the analysis to the question of whether the healthcare professionals violated the standard of care, which includes reporting child abuse or otherwise taking steps to protect child patients from further abuse of third parties. *See, e.g.*, *id.* (noting that part of the "standard of care" "triggers two protocols," one of which is "a duty to alert authorities" to the suspected child abuse).

However, the standard of care establishes "[w]hat the defendant must do, or must not do . . . to satisfy the duty"—it is not conceptually conterminous with the duty itself. Dan B. Dobbs, Robert E. Keeton & David G. Owen, *Prosser and Keeton on Torts* § 53, at 356 (5th ed. 1984) [hereinafter *Prosser*]; *see Ingram v. Howard-Needles-Tammen & Bergendoff*, 672 P.2d 1083, 1088 (Kan. 1983) (having concluded that the defendant had a legal duty "to the traveling public to exercise reasonable care in making annual bridge inspections," next asking

---

[7](...continued)
claim in this manner is wholly unpersuasive.

"[w]hat was the standard of care required of [defendant] in order to fulfill its duty").

Whether the law imposes a given duty is a purely legal determination. *See, e.g.*, *Irvin*, 31 P.3d at 942; *Woodruff*, 951 P.2d at 956; *Nero v. Kan. State Univ.*, 861 P.2d 768, 772 (Kan. 1993); *see also Black's Law Dictionary* 580 (9th ed. 2009) (specifying that a "duty" is "[a] legal obligation that is owed or due to another and that needs to be satisfied"). This proposition naturally follows from the well-established premise that a duty is "an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Wicina v. Strecker*, 747 P.2d 167, 173 (Kan. 1987) (quoting *Prosser, Law of Torts* § 53, at 325–26 (4th ed. 1971)) (internal quotation marks omitted).

Consistent with this Kansas law, distinguished commentators have discussed the conceptual distinction that exists between duty and the set of actions constituting the standard of care: "It is better to reserve 'duty' for the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other, and to deal with particular conduct in terms of a legal standard of what is required to meet the obligation." *Prosser*, *supra*, § 53 at 356; *see, e.g.*, *Black's Law Dictionary* 1535 (defining "standard of care" as "[i]n the law of negligence, the degree of care that a reasonable person should exercise").

The upshot is that a defendant may engage in careless or negligent conduct without subjecting himself to tort liability; such conduct only gives rise to tort liability when the defendant owes a legal duty to the plaintiff to refrain from acting carelessly. *See Prosser*, *supra*, at 356–57 (noting that "[i]n the early English law" "[t]he defendant's obligation to behave properly apparently was owed to all the world . . . [b]ut when negligence began to take form as a separate basis of tort liability, the courts developed the idea of duty, as a matter of some specific relation between the plaintiff and the defendant, without which there could be no liability"); *see also* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 301 (2d ed. 1995) (noting "writers use *duty* [in tort law] only to mean that there could be liability"). Kansas law reflects these fundamental principles. *See Irvin*, 31 P.3d at 942 ("Without a legal duty, there can be no *compensable negligence*." (emphasis added)); *id.* ("*Actionable* negligence must be based upon breach of duty." (emphasis added)); *Wicina*, 747 P.2d at 174 ("It is fundamental that before there can be any recovery in tort there must be a violation of a duty owed by one party to the person seeking recovery.").

Consequently, notwithstanding Ms. Portenier's efforts to couch them as part and parcel of a standard of care, in order for the healthcare professionals in the instant case to be found liable for a failure to report child abuse or otherwise take steps to protect child patients from further abuse of third parties, they must have had a legal duty to do so. Thus, Ms. Portenier's argument premised on a

-17-

standard of care is misguided.

Similarly, Ms. Portenier's reliance on evidence—notably, expert testimony and the PCAN—to demonstrate that the standard of care requires the reporting of traumatic child abuse or the implementation of other measures to protect against further child abuse from third parties misses the mark. As noted, the standard of care relates to the requisite conduct to satisfy a legal duty; it is not conterminous with the duty itself. In order to impose tort liability upon them, the healthcare professionals at issue must have had a legal duty to report child abuse or to take steps to protect the child patient from further abuse by third parties. And Ms. Portenier's marshalling of evidence cannot create such a legal duty. This is because, as noted above, whether the law imposes a given duty is a purely legal determination.[8] *See Irvin*, 31 P.3d at 942 ("[T]he fact that a plaintiff produces an expert witness who will testify that a particular act or omission constitutes 'a departure from the standard of care' [does not] establish that a duty exists as a matter of law."); *cf. Nold ex rel. Nold v. Binyon*, 31 P.3d 274, 281–84 (Kan. 2001)

---

[8] Indeed, Ms. Portenier's reliance on the PCAN is particularly misguided. For there to be a viable claim under the FTCA, the liability must flow from a violation of an obligation imposed by state law. *See Ayala*, 49 F.3d at 611 ("Even if specific behavior is statutorily required of a federal employee, the government is not liable under the FTCA unless state law recognizes a comparable liability for private persons."). The PCAN is the United States Army's protocol for handling cases of child abuse and neglect—i.e., it is not a state law obligation.

(holding that the trial court erred in excluding proffered testimony of plaintiff's expert medical witness on the breach of the standard of care of defendant hospital's nurses). Thus, Ms. Portenier's evidence-based arguments are unavailing.

Although there is no dispute that Kansas law does not hold healthcare professionals liable for failing to report child abuse or preventing third parties from injuring their patients, our final task is to predict whether the Supreme Court of Kansas would recognize such a duty as part of the overall duty to diagnose and treat traumatic child abuse. We conclude that it would not.

The two most relevant indications of whether the Supreme Court of Kansas would recognize such a duty persuasively demonstrate that it would not. First, the Supreme Court of Kansas recognized in *Kansas State Bank & Trust* that the child abuse reporting statute does not create a private right of action against individuals who fail to comply with the reporting requirements.[9] *See* 819 P.2d at 604. Second, Kansas tort principles belie the notion that such a duty would be

---

[9] Although not determinative of the question, it is noteworthy that in declining to recognize that the child abuse reporting statute created individual liability, the Supreme Court of Kansas relied in part on another jurisdiction's recognition that "such an action is not authorized at common law" and, further, cast doubt on whether recognition of such a claim would be a sound policy. *See Kan. State Bank & Trust*, 819 P.2d at 604 (quoting *Borne by Borne v. Nw. Allen Cnty. Sch. Corp.*, 532 N.E.2d 1196, 1203 (Ind. App. 1989)) (internal quotation marks omitted); *see also Adams*, 214 P.3d at 1188 (highlighting the *Kansas State Bank & Trust* court's reliance on this reasoning in *Borne* and citing it again with approval).

found to exist. As recognized by both parties and the district court, absent a "special relationship," which Ms. Portenier does not contend existed between EP and the healthcare professionals, there was no duty of the actors (the healthcare professionals) to control the conduct of a third person (Ms. Bellinger) to prevent harm to another (EP). *See Bliss*, 112 P.3d at 239; *see Calwell*, 925 P.2d at 428–29. And the harm for which Ms. Portenier seeks recompense derives entirely from injuries inflicted on EP *after* the January 15 examination by Ms. Bellinger. Notably, Ms. Portenier offers no justifications—and we could not identify any persuasive ones—for why Kansas would recognize such a duty. The only Kansas authorities relied on by Ms. Portenier do not involve, let alone discuss, the duty to diagnose and treat in such broad terms. *See, e.g.*, *Puckett*, 228 P.3d at 1054–57 (involving allegations that the failure to properly diagnose and treat a patient's urinary tract infection led to sepsis and contributed to the patient's death); *Lashure v. Felts*, 197 P.3d 885, 887–88 (Kan. Ct. App. 2008) (involving allegations that the failure to properly diagnose osteomyelitis caused unnecessary pain, suffering, and healthcare bills); *George v. Pauly*, 45 P.3d 1, 2–3 (Kan. Ct. App. 2001) (alleging that the failure to properly diagnose Hirschsprung's Disease led to the patient's death).

In sum, we hold that Ms. Portenier's claim relies on a duty that Kansas law does not (and would not) recognize—*viz.*, a duty for healthcare professionals to report child abuse or take measures to prevent one of their patients from being

subject to future episodes of child abuse at the hands of a third party, as part of their duty to diagnose and treat their patients for traumatic child abuse. "In the absence of a duty, there can be no breach of a duty and no basis for a negligence cause of action." *See Bliss*, 112 P.3d at 243. And if the government cannot be held liable under Kansas law, it cannot be liable under the FTCA. *See Hill*, 393 F.3d at 1117.

## III

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to the government on Ms. Portenier's FTCA claim.

ENTERED FOR THE COURT

Jerome A. Holmes
Circuit Judge